DANTZLER LUMBER COMPANY v. STATE OF MISSISSIPPI.

[53 South. 1.]

1. SCHOOL LANDS. *Sixteenth sections. Lands. Timber. Constitution 1890, sec. 211. Code 1906, § 4702.*

Constitution 1890, sec. 211, prohibiting the sale of sixteenth sections, school lands, does not forbid the sale of timber growing thereon; and Code 1906, § 4702, empowering the board of supervisors to sell timber from sixteenth sections, is constitutional and valid.

2. SAME. *Same. Sale of timber. Rights of purchaser.*

Sales of timber on sixteenth section school lands by the board of supervisors carry with them to the purchaser the right to enter and remove the timber within a reasonable time after his purchase, but the board cannot grant him an indefinite and unreasonable time.

3. SAME. *Same. Code 1906, § 2774.*

Under Code 1906, § 2774, providing that deeds purporting to convey more than the grantor's interest shall pass that interest alone, a deed from the board of supervisors conveying timber on a sixteenth section passes only the right which the board could lawfully convey, no matter how broad its terms.

4. SAME. *Same. Inadequacy of price.*

Inadequacy of price does not vitiate a sale of timber on sixteenth section school lands, made under Code 1906, § 4702; in the absence of fraud.

5. CONSTITUTIONAL LAW. *Construction. Assumed to be permanent. Meaning of words.*

Constitutions are to be construed upon the theory that they are permanent, and words having a definite meaning at common law are to be given that meaning, unless it be clear that they were used in a different sense.

FROM the chancery court of Harrison county.

HON. THADDEUS A. WOOD, Chancellor.

The state, appellee, was complainant in the court below; the Dantzler Lumber Company, a corporation, appellant, was defendant there. From a decree in favor of complainant the defendant appealed to the supreme court. The opinion of the court, by SMITH, J., states the facts.

*Ford, White & Ford,* and *Green & Green,* for appellant.

The first state legislature enactment authorizing the sale by boards of supervisors of the standing timber on sixteenth sections appears in chapter 41 of the Laws of 1898, amended in 1904 and later incorporated in condensed form in Code 1906, § 4702. This legislation has accordingly been in effect for over ten years, has received sanction, both judicial, executive and legislative, and has been acted upon in good faith by divers citizens and now forms the predicate of the title to real estate upon which large sums of money have been expended. It should not in this case be declared unconstitutional unless it be so beyond all reasonable doubt.

The court will not construe the law so as to make it conflict with the Constitution, but will rather put such an interpretation upon it as will avoid conflict with the Constitution and give it the force of law if this can be done without extravagance. The court may disregard the natural and usual import of the words used, and if it is possible to adopt another construction sustaining the statute, which shall not be strained or fantastic. In so doing, they may continue to act in accordance with the presumed

intention of the legislature.   For the law making body is always presumed to have acted within the scope of its power.   Black's Const. Law, 60, and see 3 Serg. & Rawls, 63, 73; *Harrison County v. Moss Point Lumber Co.,* 89 Miss. 536.

This court has sanctioned the evolution of legislation wherein a sale of timber was authorized, by assuming the unanswerable position that the law was a natural growth prescribing a rule of action commensurate with the needs of advanced civilization and when the timber became of such value as that it was for the interest of the wards that it be sold, then in accordance with the declaration of this court, the legislature was appealed to, and in answer to this appeal, which this court has since directed and sanctioned, the legislation was enacted.

Furthermore, the distinction between the prohibiting against the sale of the lands reserved for the support of township schools and the sale of the timber growing upon such lands is unequivocally established.   *Harrison County v. Moss Point Lumber Co.,* 89 Miss. 565.

We direct particular attention to this portion of the opinion in *Harrison County v. Moss Point Lumber Co., supra,* demonstrating that the judicial mind had in it a definite distinction between the sixteenth section land reserved for the support of schools and the mere trees growing thereon, which by fiction of law have been denominated land, because partaking in certain aspects, of its nature.   Trees grow up and are cut down, are destroyed by each passing hurricane, while the land continues unchanged and immovable.

The Mississippi decision above cited, determines that the constitutional prohibition extends only to land in its appropriate and narrower signification, namely, the soil itself, and that the acts of 1898 and 1904 dealing with the timber did not come within the constitutional inhibition.

The word used in the constitution is not "land," but "lands,"

the plural as contradistinguished from the singular, and further-more as limited by a clause of reservation for the support of the schools. The timber is separable, severable and distinct from the soil as said in the *Moss Point Lumber Company case,* *supra,* at page 567: "Decades count for little, so far as time is concerned, in the earthly immortality of a state," but the prop-osition is that the timber on the land is there today and gone tomorrow, and that it is subject to every wind, and after it reaches its maturity it begins to decay and die. If not harvested when ripe it deteriorates and becomes wholly worthless, and will, in the course of a short time, be succeeded by another and different growth; the long leaf pine first by the oak, and again the oak by the long leaf pine, and so on through the several mutations and under well settled principles.

When a word of ordinary signification is used in the con-stitution it is given its common interpretation. Where words have a strictly legal meaning they are to be given such meaning; but where such meaning has obviously no application, and where such a construction would lead to absurd results, and where the popular and usual acceptance of the term is manifest throughout the entire context it is almost useless to argue its meaning. If opposing counsel's contention be correct, namely, that the constitution by the use of the word "lands" embraced the trees growing thereon, then, we ask, why was the verbiage adopted of "uncleared lands," drawing a distinction between the soil and the trees growing thereon? If it be assumed that a valuable coal deposit existed on sixteenth section land, could it be legally contended that section 211 of the constitution pro-hibited the utilization thereof, because it was land, and when by reason of the prohibition the children of the township on account of such good fortune would be deprived of an education by reason of the fact that no disposition could be made of that which belonged in trust to them, and which was dedicated to

the purposes of their education? Is the phraseology of the section so uselessly extended as that its words are to work a destruction of the purpose that was sought to be conserved thereby? Assume a lake or spring, whose waters are valuable to be upon sixteenth section land, would it be contended that since waters as well as trees are embraced within the legal signification of land, the children of the township should be denied the revenue derived by reason of the prohibition of the sale of that which was transient?

Assume the sole value of the sixteenth section to be growing timber, are the school children of that townshsip to be deprived of an education by reason of the prohibition in this section against the sale of that alone which congress has expressly provided for their education? Would not our constitution itself be invalid as a violation of the federal constitution and statutes, and of the conditions upon which Mississippi was admitted to the Union, if it were attempted to enact a law whereby such a result were attainable? Congress has ratified both leases and sales and the sixteenth sections have been dedicated to the children for their education. And can this state now pass an act whereby the obligation of the contract made a century ago will be impaired, and the school children be deprived of their property without due process of law by an enactment of the convention which seeks to divert from its appointed course property devoted by national acts to the education of the children of the commonwealth?

Furthermore, suppose a great storm arose whereby the timber was severed from the soil, it would then become personalty and could be sold as such because the prohibition extended to the land only. The time of such severance by the storm would be most inopportune for a realization upon the value of the trees as they would have been twisted and torn by the storm, and yet opposing counsel in effect contend that without the intervention

of such an unfortunate occurrence, the legislature is without power to dispose of the timber. It seems absurd to think that the school children for whose benefit a power was vested in the state would not, when the section was uncleared, be compelled to go without an education awaiting a catastrophe to destroy in large measures the trust estate so that the remainder could be available for their purposes.

The constitutional section must be construed by its four corners. The first portion hereof was dealing manifestly with cleared lands and had no reference whatever to those uncleared. This is true by reason of the fact that an annual rental was expected to be realized from them, and certainly no sane man could expect an annual rent from a forest. Futhermore, express provision is made with regard to the "uncleared land" and the legislature given power to do what it sees fit, and, *inter alia,* to lease the land for some short period in consideration of its improvement. This demonstrates that the legislature was to have power to do what it saw fit in the premises, and could sell the timber. The opening portion of this provision of the Constitution provides that the legislature shall do certain acts positively and unequivocally, but in its concluding portion provides merely that the legislature may do these things. Permissive, as contradistinguished from compulsory; directory as contradistinguished from the mandatory expression of the prior portion of the section. We are well aware that some times "may" is to be read as "must," but in the present instance there is no necessity in so doing. The act merely defines a course that the legislature can pursue after declaring certain principles for legislative guidance in the opening portions of the section. Certainly the removal of the timber is contemplated with regard to the improvement of the section, and there being no provision prohibiting the legislature from selling the timber, the constitution would work this absurd rule.

The legislature, unlike congress, has full power in the premises unless restrained by constitutional limitations, and the only restriction imposed is that the lands reserved shall never be sold, yet this court held in the *Gans case,* 80 Miss. 81, and in the *Moss Point Lumber case, supra,* that timber growing upon agricultural land could be cut down and sold provided only in so doing the reversion was ameliorated, and that the action in so cutting was the act of a prudent owner in fee. This right to cut the timber and the right to sell the timber when cut has been held to exist under the constitution.

Now if this timber were land there would be no power to authorize such a lease, as the greater always includes the lesser, and this construction would render impossible such cutting as would ameliorate the inheritance, and make such improvement of the property as was contemplated by the last section of the present provision so that the provision would thereby become contradictory. The first portion authorizes a lease, which lease under the settled law of waste in Mississippi carries with it as an incident the cutting and selling of the timber under certain limitations, yet by the same provision opposing counsel would contend that this selling of the timber in this manner is prohibited, and hence no lease could be made, and as this court has held such lease effectual to convey the right to cut timber in order to cultivate the land, now to hold that under this provision such power did not exist would, we contend, be absurd. It would result in the state being forbidden directly to make land available as arable land, and as that which cannot be done by indirection, no lease could be made of this land whereon timber was growing as will give the lessees under the settled law of the state a right to cut timber for purposes of agriculture and to sell it thereafter. This would violate the constitution and be void and would result in a prohibition against clearing the land and putting it in arable shape when

by the terms of the constitution itself it is expressly declared that with reference to uncleared land a lease could be made of the same without other consideration than the doing of the very thing which would be prohibited under counsel's construction of this section.   Such cannot be the law as thereby the greater element of timber would be a white elephant upon the hands of any one who might be so fortunate as to make a lease of any uncleared lands, as the constitution would prohibit by iron clad rules the sale of any timber, and consequently no agriculture could flourish because of the want of clearing. This would lead to the absurd conclusion, because the very terms of the constitution provide that this land shall be leased for an annual rental, and that such annual rental is predicable solely of agricultural lands, and if the right to properly husband such land be denied, the very purpose of the constitution would be denied.   For instance, suppose by reason of an overflow or severe rain storm the crops for one year should be destroyed, and the land grow up in small trees, these little trees are as much "land" as would be the largest of trees, nevertheless, opposing counsel contend that even these could not be removed for the purpose of clearing the land and making it productive and disposed of if a purchaser could be found; or directly assume that a house was erected upon the land which became uninhabitable by reason of decay, certainly the house would be as much covered by the description "land" as would be the trees, and yet we suspect that even opposing counsel would not claim that this prohibition operated to prevent a sale being made of that when it had been uninhabitable and yet if the prohibition were construed to extend to everything embraced by the words "land" instead of that which is usually meant when the term is applied, such would be the result.

The express purpose of the Constitution was to create an

annual revenue derivable from the rent of this land, but unless .
the right to cut and remove the timber and put it in such
shape that it could be used for agricultural purposes was also·
given, this express purpose of the legislature would be de-
feated.

Appellant is the owner of a ninety-nine year lease upon all
of the property in question and has yet unexpired over seventy
years during which it is entitled to the exclusive possession of·
the land, to have said timber remain on it or to clear it as the
dictates of good husbandry require and dispose of the timber
when so cleared under the rules announced by this court in the·
*Gans case, supra,* and the only thing that appellant lacked was
the right to cut these trees or some of them for the purpose of
sale and not husbandry and there was vested in it the right to
estovers and such other usages as are usual in that section.
While it is impracticable as yet to cultivate the lands it is need-
less to add that in the advance of science coupled with the in-
crease of population such cultivation will be essential, and when
such right does accrue then the correlative right to fell the tim-
ber and dispose of it will also accrue.  Already appellant has the·
exclusive possession and the right under that possession to cut
and burn the fallen trees, and under the lease appellant has the·
right if it sees fit to have these trees remain as long as the lease-
hold exists, and there is no practical way under these conditions
to place a limit in the timber deeds; and there is no interest in·
the state to compel the removal of this timber because when
removed the land will not revert to the state but will remain
in the possession of appellant.

There was not a conveyance of this timber in ·fee nor any
warranty whatever given, but it was sold under the designation
of merchantable timber and for that purpose, and if appellant
were not the owner of the term an entirely different question
might arise, for then having purchased the merchantable timber

for the purpose as outlined by this court in the *Moss Point case,* *supra,* he thereby acquired the entire estate in the property and would have the right to cut it for purposes of profit.

In *Gex v. Dill,* 86 Miss. 10, this court held that where a turpentine lease omitted to give the date when the rights it granted should begin and end, but work was commenced thereunder within two years, a contention that the lease was void as tending to create a perpetuity was untenable. *Gadberry v. Sheppard,* 27 Miss. 207; *Railroad Co. v. Neighbors,* 51 Miss. 413.

In February, 1907, the property in question was advertised for sale by publication for three weeks in the Gulfport Tribune, a newspaper, and was offered for sale at auction in front of the court house to the highest bidder for cash. After it had been sold the board of supervisors made an order that it considered the price paid fair and reasonable, approved the sale and ordered the deed to be delivered. *Warren County v. Gans,* 80 Miss. 81; 4 Kent, Comm. 76 *et seq.; Jackson v. Brownson,* 7 Johns. 232; *Mooers v. Wait,* 3 Wend. 104.

When the appellee attacks the sale upon the ground that there was no consideration therefor, this assumes the power of the board of supervisors to make the sale, the constitutionality of the sale whereunder the same was done and that everything was regular, but what was received for this land at the public sale by the constituted authorities therefor was of such an amount as that it would have been sufficient to entitle the transaction to be declared void. There is no doubt that the consideration was paid and received; and is even now being used by the appellee, and the question of the right to rescind upon the ground of fraud presupposes the election upon the part of the one defrauded to act, to set aside the transaction. A transaction tainted with fraud is not void but voidable only and that too at the election of the party defrauded.

*May & Sanders, L. H. Doty,* and *Flowers, Fletcher & Whit-field,* for appellee.

The Acts of 1898 and 1904 under which the sale was made,. are violative of section 211 of the state constitution of 1890. The five provisions of that constitution are as follows:

(1) The legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, or land granted in lieu thereof in. the Choctaw purchase.

(2) And shall provide that the sixteenth section lands reserved for the support of township schools shall not be sold.

(3) Nor shall they be leased for a longer term than ten years for a gross sum.

(4) But the legislature may provide for the lease of any of said lands for a term not exceeding twenty-five years for a. ground rental, payable annually.

(5) And in case of uncleared lands, may lease them for such short term as may be deemed proper in consideration of the improvement thereof; with right thereafter to lease for a. term or to hold on payment of ground rent.

The constitutional section required legislation upon the subject of sixteenth section school lands. Five provisions are required to be put into such legislation. Two of them deal with all the property; the next two relate to cleared lands; the fifth and last to uncleared lands. The first enjoins upon the legislature the duty to enact laws to ascertain the true condition of the title; and the second the duty to enact that the lands shall not be sold, that is, to prescribe what shall not be done with them. The other three direct the legislature what to enact as to the leasing of them, that is, what may be done with them. The second requires that a certain thing shall not be done, the other four direct that certain things shall be (or may be) done.

The three things the legislature may do with these lands, as prescribed by this section, through laws to be executed by such agencies as may be provided, are (1) the leasing for not longer than ten years for a gross sum; (2) the leasing for not longer than twenty-five years for a ground rental, payable annually; (3) the leasing of uncleared lands for a short term in consideration of the improvement thereof with the right thereafter (to the lessee) to lease for a term, or hold on payment of ground rent. All the things which the legislature may authorize are the making of different kinds of leases. The thing which it cannot authorize is the sale of the land. There are three kinds of lease contracts provided, one for a gross sum, one for a ground rental payable annually, and one for improvement of the land. The first can be made for not longer than ten years, the second for not longer than twenty-five years, the third for a "short term."

It is our construction of Constitutional section 211 that in enjoining upon the legislature the enactment of laws against the sale of the land, it means that such laws, so passed in execution of this mandate, shall prohibit the sale of the timber standing and growing on the land. Our position is that the words, "sixteenth section lands reserved for the support of township schools," embrace the timber standing on the land, fastened to it, growing out of it. We contend that the growing timber attached to the soil is part and parcel of it, and is as certainly embraced within the meaning of the general word, "land," as is the soil itself. *Dils v. Hatcher,* 69 S. W. 1092; *Van Doren v. Fenton,* 103 N. W. 228.

In providing that the land should not be sold, but leased, and that for a short term only, the purpose is plain to preserve the corpus of the property intact. This is plainly the general purpose of these provisions. The state proposed to keep the property under its control. If a mistake should be made in the

disposition of the property by any officer or agency, it would not be irremediable. It could be corrected. There would be no great, irreparable loss. If the property should be leased for a gross sum it would not be under the control of the state during the term of the lease, hence said term was required to be a short one, not longer than ten years. If a ground rental should be received annually, then the term could be made longer, that is, for not exceeding twenty-five years. If a lease should be made in consideration of improvement, this should be made for a "short term." All these provisions, considered together, make the general purpose very clear, that is, to retain control of the corpus of the estate; to allow it to pass from under the control of the state for only a short period at a time. And this general purpose was a wise one. This property is intended for the benefit of the children of succeeding generations. No management can possibly be perfect. Mistakes will, of necessity, be made. However vigilant the supervision, the agents representing the state will make mistakes. A mistake might be made in one township which would destroy the rights and property of the school children for generations. *Kingsley v. Holbrook,* 86 Am. Dec. 173.

The Constitution makers had the timber portion of the state in mind at the time section 211 was framed, or they did not have it in mind. First let us assume that they did have it in mind. Then we find them placing an inhibition upon the sale of these "lands," using a word which usually embraces the soil and everything attached to it. They used it, knowing at the time that the term would convey the timber and that trees growing on the land could not be sold in the face of this inhibition. The term was used advisedly, with a full understanding of its import. It was known that to forbid the sale of the land meant to forbid the sale of the timber also, and yet the provision was put into the fundamental law. Of neces-

sity it was the intention to prohibit the sale of the timber just as the sale of every other part of the land was forbidden. Besides, if the authors of the said provision had the timber country in mind, and had intended to leave to the legislature the power to provide for sales of timber, some safeguards would have been thrown around the exercise of such power just as was done in the directions given as to the making of leases. The time within which it must be removed; the way by which the value should be ascertained; the manner in which the payment of the consideration should be made; the amount of timber which should be left on the land to preserve the stock and continue the growth:—these are all details which would naturally have engaged the attention of the men who were drafting that section if they had intended that the legislature should provide for the sale of the timber. They were specific when dealing with leases; they certainly would have been more specific when dealing with the sale of timber standing and growing on land constituting its real and only value. We have no doubt of the soundness of our conclusion that the authors of section 211 did not intend that the timber should be sold if we assume that at the time they had the fact in mind that a large part of Mississippi is valuable alone for its timber. And may we not indulge the presumption that they had this information? Was not the body made up of men from all parts of the state? Were there not men from the timber territory? Did they not meet and hold their sessions within an hour's walk of virgin forests? Having the fact in mind, they wrote the provision so as to limit the power of the legislature to the authorization of leases, prohibiting regulations under which sales of any part of the land should be made. *Hogg v. Frasier*, 70 S. W. 291; *Pritchett v. Davis*, 65 Am. St. Rep. 298.

But let us take the other alternative,—assume that the au-

thors of this section overlooked the fact that a large part of the territory of this state is valuable for its timber only. Then we find that a term was, in fact, used which embraces the standing and growing timber and that it was used with its ordinary, legal signification, and without any purpose to give it a special or restricted meaning. There was no purpose to leave the question of selling the timber to the legislature because it was not thought of. While other details about the handling of this property through leases were being considered, the matter of selling the timber was not thought of and was not provided for. While less important things were remembered, this was forgotten.. It might be answered by the appellant at this point that since the authors of the instrument forgot about the conditions peculiar to the timber domain, they failed to prohibit the sale of the timber, failed by omission, by inadvertence. We reply that they used a word, "lands," which ordinarily includes the timber fastened to the soil, and in the absence of any expression indicating a different purpose, we must assume that the word was used with the same meaning which it carries universally in statutes and legal instruments. We have the general plan clearly outlined and it is subserved by giving to the word its ordinary meaning and is thwarted by giving to this word a restricted and rare definition. To give the word the restricted meaning contended for by appellant would destroy the plan of the enactment above discussed herein. The section is in the nature of a "conservation" provision; a husbanding of resources. *Dailey v. Swope,* 47 Miss. 383; *Hawkins v. Carroll,* 50 Miss. 758; *Carpenter v. State,* 4 How. (Miss.) 166.

The word "lands" employed has a well defined meaning not only in the common acceptation and use of the word, but also as a word used as a legal term. If it is possible for a court to commit itself irrevocably to a proposition, ours is bound by its

frequent use and reaffirmation of the principle that the word "land" embraces the soil and everything attached to it. In fact it would seem that our court has prepared itself specifically for the adoption of the construction of section 211 for which we are here contending; that it has reached the point in its announcements where there is nothing left to be done except to declare that this term, used in this section, carries the growing timber attached to the soil.

In 1858 this court held, through Justice HANDY, that an agreement for the sale of growing trees "to be cut by the vendee and removed" is a contract for the sale of lands, tenements and hereditaments, and, therefore, within the statute of frauds. And it will be noted that the sale was made of standing trees with the expectation that they would be cut and removed from the land. In some states it seems this would have been held to be a sale of personalty. But our court said "the term 'land', embraces not only the soil, but its natural produce growing upon and affixed to it. Such things, being the natural product of the land, are part and parcel of it, and, therefore pass by a grant of the land." *Harrell v. Miller,* 35 Miss. 700, 72 Am. Dec. 154.

In 1892 our court held, through Justice WOODS, that a conveyance of the merchantable timber, of certain dimensions, on the homestead with an indefinite time for its removal, signed by the husband only was void. It was held that since the growing timber is a part of the land, and hence a part of the homestead, the wife must join in the conveyance. The court referred to *Harrell v. Miller* and depended upon it as an authority. It was said "the growing trees are part and parcel of the land, and the sale of such trees, and especially the wholesale conveyance shown in the case at bar, with the large diminution in value of the homestead, is clearly and inevitably the sale of an interest in the land." And it will be noted that in

the case at bar the deed made by the board of supervisors of Harrison county conveyed all the merchantable timber and wood on the land, thus destroying practically the entire value of the land. *McKenzie v. Shows,* 70 Miss. 388, 12 South. 336, 35 Am. St. Rep. 654.

In 1894 our court held, through Chief Justice CAMPBELL, that a verbal sale of growing timber is void. And there it appears, the timber was sold to be immediately removed. *Nelson v. Lawson,* 71 Miss. 819.

In 1896 our court again held, through Justice STOCKDALE, relying upon the three cases above mentioned, that a parol agreement for the sale of standing timber is within the statute of frauds, and is void. The court again said: "To convey the growing timber is to convey an interest in the land." *Walton v. Lowrey,* 74 Miss. 484.

In 1902 our court again held, through Justice TERRAL, that timber growing upon land separately owned should be assessed to its owner on the realty roll. It is said again in that case "by the common law, trees are a part and parcel of the land upon which they are growing or standing, for the term 'land' embraces not only the soil, but its natural productions; the trees growing or standing upon land are not distinguishable, in their character of real estate, from the soil itself, until they are actually severed from the soil." And the court cites the cases *supra*. *Fox v. Lumber Co.,* 80 Miss. 1.

In *Hall v. Eastman-Gardiner & Co.,* 89 Miss. 588, several of the counsel representing this appellant joined in a brief for the appellee in that case and reviewed these cases above mentioned, and found them to have established this definition of the word "land," and in that case they insisted that the timber was a part of the real estate and that a deed to it conveyed an interest in the realty. This contention was made by them, and while it was not questioned by the court in its opinion, the results for

which counsel were contending in that case was not considered by the court to follow.

In 1908 this court, through Justice MAYES, now Chief Justice, had occasion to reaffirm the doctrine, and to hold expressly that a contract of the kind which the board of supervisors made with this appellant conveyed an interest in the realty, a fee simple interest. The court reviewed the former holdings of the court in the several cases discussed *supra,* and, among other things, it was said in this last case: "It is thus seen, from the former decisions of this court, that while it is recognized that there may be different ownerships in real estate, according to its different character, trees, land, etc., yet the fact that its ownership may be diverse does not change its character as real estate until actually severed. This being the case, a fee simple title can be made for one character of real estate as well as another. It is as lawful and binding to make a fee simple title to the trees forming a part of this land as it would have been to make a deed to the entire real estate, including the land." In the contract construed by the court in that case, as well as in the contract now before the court, no stipulation as to the time within which the cutting of the timber should be begun or completed was found. There was an unqualified conveyance of the timber. And in the case at bar there is a conveyance of the timber without any time limitation upon the right to remove it. *Butterfield Lumber Co. v. Guy,* 92 Miss. 361.

So it appears that every time an occasion has presented itself, this court has said that the word, "land," embraces the soil and everything fastened to it. This term as used in the statute of frauds has this meaning. As used in the acts exempting a homestead of one hundred and sixty acres, and making void a conveyance of a homestead by the husband without the signature of his wife, it has this meaning. The statutes regarding the assessment of property provide that the realty

shall be put on one roll and the personalty on another. Our court has held that where the timber is separately owned it should be assessed to its owner on the land roll. And in the last case cited, the court had occasion to depend upon this principle, or this definition, for the solution of another question, and did, in fact, make this definition the basis of the decision in that case. Every time the court has had an opportunity to define this term, it has given it this meaning.

The only argument which can be made in any state with whose decisions we are familiar in support of the proposition that the sale of the timber is not a sale of a part of the land, is that, when timber is sold with the purpose of having it removed at an early date, it may be considered a sale of chattels. If the acts of 1898 and 1904 do not violate constitutional section 211, their validity would have to be upheld on the theory that the sale of the timber is a sale of chattels and not a sale of real property or lands. In jurisdictions where such an argument could be made it would not avail upon facts like these here present. In any jurisdiction the contract here before the court would be treated as a conveyance of a fee simple interest in the land itself so that if the said acts are valid, they do not authorize this contract. They could only authorize the making of such contracts as would convey personal property.

In *Butterfield Lumber Co. v. Guy,* 92 Miss. 361, this court carefully considered the question as to whether in this state there is any such thing as a conveyance of a chattel interest in land. It seems that in some jurisdictions there may be a conveyance of standing timber by parol; that timber sold for the purpose of being removed at an early date may be considered personal property. The court said: "The earlier cases seem to be to this effect, and hence by those courts which followed this line of authority it was held that where there was a sale of timber, with no time specified for the removal, being a sale of

personalty only, and not an interest in the realty, there was an implied condition on the part of the seller and the purchaser that the timber should be removed within a reasonable time." The court decided in that case that in this state a conveyance of timber is a conveyance of land or realty; that the rule followed in some other states is not the law of this state.

In our judgment the finding by the chancellor that this contract is tainted with fraud to such an extent as to make it void is sufficient for the purpose of this consideration. The appellant paid $1,550 for all the merchantable timber and wood on these sections. Under this contract the appellant could remove every stick of timber or wood on the sections of land. There were four sections having an average value of $387.50 each. Under the agreed statement of facts there was something over 7,000,000 feet of merchantable timber on these four sections ten inches in diameter, each tree measured sixteen feet from the ground. It was agreed that it was worth at the time this trade was made, three dollars per thousand feet, or something over $21,000. The timber of the sizes described was worth something like fourteen times the amount paid for all the timber and wood on the said lands. While it was worth three dollars per thousand feet the appellant got it for about twenty-two cents per thousand feet. It not only bought the large timber on this basis, but, besides, got all the timber under ten inches in diameter sixteen feet from the ground, for nothing; and got all the increase of the said timber during the time the contract should run, which is indefinite. In other words by paying twenty-two cents a thousand feet for the large timber worth at least three dollars per thousand feet, appellant got all the timber and wood, large and small, present and future, thrown in. It got all the timber possibilities of this land by paying twenty-two cents per thousand feet for a part of the timber worth in itself fifteen times that amount. There must of a necessity have been con-

siderable timber on this land under ten inches in diameter sixteen feet from the ground. Timber which will measure ten inches in diameter this far from the ground is a good-sized tree. Appellant only paid twenty-two cents per thousand feet for it, if we estimate that part of it only which will measure ten inches in diameter sixteen feet from the ground. This part in itself is admitted to have been worth fifteen times that sum. In fifteen years from this date the smaller timber on this land will develop sufficiently to pay this price many times over. Throughout the term of the lease and longer, appellant can use this property just as though it had the fee simple title to it; strip it of every piece of its timber and leave it as bare as a floor; convert it into waste land and render it absolutely worthless for any purpose until it can be found valuable for some sort of farming industry.

*S. S. Hudson,* attorney-general, on the same side.

In *Jones v. Madison County,* 72 Miss. 777, the independence of this state from the national government was found to exist not only because the federal government was bound by the agreement with Georgia, but also because of the established policy of the general government. The legal title to these lands is in the state. "By virtue of the compact between Georgia and the United States as to the lands situated in this state, and by reason of the great and uniform public policy of the United States as to states formed from other territories, there is pledged to the several states, for the use of the inhabitants of the several townships, all sixteenth sections of land and * * * title thereto passed to the state by reason of the survey and designation of the land, without the necessity of a patent or grant by special law."

The act of congress of March 1, 1817, authorized the people of the western part of the Mississippi territory to form a con-

stitution, republican, and not in conflict with the ordinance of 1787, U. S. Statutes at Large, vol. 3, pp. 348–350.

The resolution admitting Mississippi as a state, into the union, of date December 10, 1817, found that her Constitution conformed to the ordinance of 1787 and she was admitted on an equal footing with the original thirteen states.    U. S. Statutes at Large, vol. 3, pp. 472, 473.

When the state was admitted it had the boundaries which it now has, the lines running to the Gulf of Mexico, and including the land involved in this suit.    The country south of thirty-first degree of latitude and east of the Pearl River was added to the territory by an act of congress of May 14, 1812— almost one hundred years ago.    By that act the said added territory was "to be governed by the laws now in force therein, or which may hereafter be enacted, and the laws and ordinances by the United States, relative thereto, in like manner as if the same had originally formed a part of the said territory." U. S. Statutes at Large, vol. 2, p. 234.

On April 7, 1788, Congress passed an act looking to the establishment of a government in the Mississippi territory to be in all respects similar to that in the territory northwest of the Ohio River.    Statutes at Large, vol 1, pp. 549, 550.

By an act of March 3, 1803, providing for the disposal of lands south of the state of Tennessee it is expressly provided that the section in each township numbered sixteen shall not be put on the market but "shall be reserved in each township for the support of schools within the same."    Section 12 of the act.    This act refers expressly to western Florida.    Statutes at Large, vol. 2, pp. 229–235.    And in another act relating to the lands in the Mississippi territory of March 3, 1817, the reservation of the sixteenth section is expressly made. Section 3 of the act.    Statutes at Large, vol. 3, p. 375.    The reservation was expressly made also in act of May 6, 1822, re-

lating to territory south of the thirty-first parallel. Statutes at Large, vol. 3, pp. 680–681. By the act of May 20, 1826, congress provided for the selection by the secretary of the treasury of lands to take the place of these reserved by law for school purposes and which were not available for that purpose—lieu lands. Statutes at Large, vol. 4, p. 179.

So it appears that the case of *Hester v. Crisler* was overruled by the court in *Jones v. Madison County, supra;* and that the court in the former case did not examine the statutes upon the subject very carefully. And in the case of *Jones v. Madison County* it seemed to be sufficient to support the conclusion reached in that case that there was in force a large public policy which required the reservation of one section in each township. But while that may be sufficient we have the acts of congress expressly reserving the sixteenth sections in the Mississippi territory and then adding to the Mississippi territory the country south of the thirty-first parallel. It was provided that the same laws in force in the original territory should apply to the new addition to the same extent as they would if the country south of the thirty-first parallel had been a part of this territory. And then by subsequent acts in 1817 and 1822 the reservation is made touching the entire Mississippi territory after the addition of part of west Florida was made. So we find that we are not even dependent upon the policy of the government but we have the acts of Congress to depend upon as to this school land, and what was once west Florida is in the same category with that in the other parts of the state. And the acts of 1826 provided for the substitution of lands where the sixteenth section itself was not available on account of prior claims which the government was compelled to respect covered this territory not embraced in the Georgia session just the same as the other. And it is a matter of public information evidenced by the public records in the offices of the state

government, that about the year 1890 a large tract of land was donated to the state to be used in lieu of sixteenth sections where these were not available and these lands were donated to the state for the benefit of the deficient sections south of the thirty-first parallel just the same as for the territory north of that line.

This is no effort to set aside a sale as in fraud of creditors. Nor is it an attempt to set aside a sale at the instance of one of the parties to the transaction. But it is a proceeding by the state to cancel a deed made by trustees to a corporation which was fully informed of the value of the property, of the capacity in which the trustees were acting, of the doubtfulness of the powers which were attempted to be exercised.

In *James v. Gibbs* (Va.), 1 Pat. & H. 277, a trustee sold an interest in land pending partition proceedings for a grossly inadequate price, when by waiting a few days the real value could have been ascertained. The sale was treated as a nullity.

It appears in *Wright v. Wilson* (Tenn.), 2 Yerg. 294, that a trustee sold property worth $500 for $50. The sale was set aside. And see *Carter v. Ashbire,* 48 Mo. 300; *Clark v. St. Louis, etc., R. Co.,* 58 How. 21.

Argued orally by *M. Green; R. P. Willing* and *Edward Mayes,* for appellant, and by *James N. Flowers,* for appellee.

SMITH, J., delivered the opinion of the court.

The appellant, lessee of certain sixteenth section lands situated in Harrison county, valuable only for the timber situated thereon, purchased said timber from the board of supervisors of said county, under the provisions of the Code of 1906, § 4702, authorizing such sales. This suit was thereafter instituted in the court below by appellee to cancel the deed made by the board to the timber pursuant to said sale. From a decree in accordance with the prayer of said bill this appeal is taken.

The validity of this sale is challenged upon several grounds, the first of which is: "Because the acts of the legislature under which said sale was made are violative of section 211 of the Constitution of 1890."

Section 211 of the Constitution of 1890 is as follows: "The legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, or land granted in lieu thereof, in the Choctaw Purchase, and shall provide that the sixteenth section lands reserved for the support of township schools shall not be sold, nor shall they be leased for a longer term than ten years for a gross sum; but the legislature may provide for the lease of any of said lands for a term not exceeding twenty-five years for a ground rental, payable annually, and, in case of uncleared lands, may lease them for such short term as may be deemed proper in consideration of the improvement thereof, with right thereafter to lease for a term or to hold on payment of ground rent."

Section 4702 of the Code of 1906 (first enacted in 1898) is as follows: "That the board of supervisors in counties having control of any sixteenth section of land, or a part of such section, or of another section or part of a section taken in lieu of any sixteenth section or a part thereof, reserved for the support of township schools, be, and they are hereby, authorized and empowered to sell the merchantable timber of any and all varieties and wood on such land, or to lease for a term not exceeding three years said lands for turpentine, or pasturage purposes for a term not exceeding one year. The funds arising from the sale of such timber or wood, or from the lease for turpentine or pasturage purposes shall be credited to the proper township, and the treasurer of each county shall keep a separate account with each township. Such funds shall not be expended, but shall be loaned out by the boards of supervisors in the same manner and under the same restrictions as is provided by law for the loan and

security of other sixteenth section funds. The interest arising from such funds shall be expended for the support of the township schools as is provided by law for the expenditure of the interest on other sixteenth sections."

The question to be answered by us is: Do the words, "the sixteenth section lands reserved for the support of township schools shall not be sold," contained in the above section of the Constitution, prohibit the sale of the timber growing on such land? Should this question be answered in the affirmative, the statute, of course, would be unconstitutional. It has long since been settled in this state, by a line of decisions beginning with *Harrell v. Miller,* 35 Miss. 701, 72 Am. Dec. 154, that at common law "the term 'land' embraces not only the soil, but *its* natural produce (trees) growing upon and affixed to it." It is also settled that, in construing a Constitution, words having a certain and definite meaning at common law should, when used in a Constitution, be given that meaning, unless it is clear from the instrument itself that same are used in a different sense. *Daily v. Swope,* 47 Miss. 367.

In order to determine the sense in which the word "lands" is used in this section of the Constitution, it will be necessary for us to consider briefly the law prior to the adoption of this section and the evils it was intended to remedy. Prior thereto the legislature could deal with these lands almost at its pleasure, and the result was that most of them had been leased for a period of ninety-nine years for a small sum in gross, and this small sum was frequently never collected, and, when collected, generally wasted. The remedy provided for this evil by this section of the Constitution is that the title to these lands shall never pass out of the state, and that all leases thereafter made shall be only for a short period of time, thereby insuring for all time the receipt by the schools of a stated revenue, either annually or at comparatively short intervals of time. It is manifest, therefore,

that the framers of the Constitution did not intend to cut off any source of revenue from these lands, which did not necessitate the divesting of the state's title thereto or its control thereof. They were dealing with lands, nearly all of which were primarily agricultural lands, valuable only as such, and they intended only to prevent the sale of the thing out of which crops, annual or perennial, are produced. The word "lands," therefore, was used in that restricted sense in which it is so frequently used in common parlance, meaning, not the soil and everything above and below it, but simply the soil itself. The prohibition, therefore, extends only to the land, using the term in this restricted sense, and not to the timber growing on the land.

It is hardly possible that the framers of the Constitution meant to prohibit the sale of timber, thus cutting the schools off from any revenue which might be derived therefrom, when in the same section they authorized leases of these lands to be made, the consideration thereof being only the improvement thereof; the principal item of improvement consisting, of course, in the removal of timber, the title to which timber would thereby pass to the lessee. By selling the timber, its removal would constitute an additional source of revenue, and the land could be brought into cultivation at comparatively small expense. It is also hardly possible that it was meant by this section of the Constitution to prohibit the sale of timber, when in some instances, as in the case at bar, the sale of the timber would constitute the only source of revenue therefrom; the soil being unsuitable for agricultural purposes. To so hold would deprive the schools of the townships in which such lands are situated, possibly forever, of any revenue therefrom, and convict the state of having, to that extent, violated the trust which it assumed when it accepted these lands.

It is said by counsel that: "The makers of the Constitution of

1890 thought best to prohibit for the present the sale of it, and leave it to the people to dispose of this part of the property when they should decide that the time for such disposition had arrived." It is true that Constitutions may be amended; but it is also true that this can be done only with great difficulty, and, moreover, frequent changes in the fundamental law of a state are not desirable. But, be that as it may, Constitutions must be construed upon the theory that they were intended to last for all time. The supreme court of the United States long since has said, in *Martin v. Hunter*, 1 Wheat. 304, 4 L. Ed. 97, that the Constitution was not intended to provide merely for the exigencies of a few years, but was to endure through a long lapse of ages.

And, moreover, there are two elementary rules of construction which should always be borne in mind when the constitutionality of the statute is called in question. The first is that statutes are always presumed to be constitutional, and this presumption will be indulged in by the courts until the contrary is shown; all doubts being resolved in favor of the validity of the statute. The second is that where there is an ambiguity or doubt, or where two views may be well entertained of the meaning of a constitutional provision, the legislative construction thereof is entitled to great weight. *State v. Henry*, 87 Miss. 125, 40 South. 152, 5 L. R. A. (N. S.) 340; 8 Cyc. 801; Cooley's Const. Limitations (7th ed.) 252; Digest U. S. Supreme Court Reports (Law. Ed.), vol. 2, p. 1577, and authorities there cited.

In *State v. Henry, supra,* these rules were thus announced: "In solving the question first to be considered, the interpreter of the language used must carry along with him the elementary principle that, if there be a well-founded, reasonable doubt of the constitutionality of a legislative act, it must be held constitutional. This is a well-recognized rule of the courts, ever vigilant, as they should be, of the rights and prerogatives of

each branch of the governmental body politic. This rule is based on common sense. Each branch represents the people. Each branch, legislative, executive, or judicial, is the people, by the intendment of the organic law, in its proper sphere, and must be presumed to act within its powers under the Constitution, unless the contrary plainly appears. To the courts only is the authority given to determine this, and great caution should be, and always is, exercised by them in such delicate inquiries. Otherwise, instead of being the final refuge of liberty, they would be its grave."

The second ground upon which the decree of the court below is challenged is: "Because the sale made by the board of supervisors in this instance was void, even though the said acts of the legislature might be valid since the contract evidenced a purpose to convey thereby a fee-simple interest in the land; no time limit being fixed within which the timber must be removed."

In *Butterfield v. Guy,* 92 Miss. 361, 46 South. 78, 15 L. R. A. (N. S.) 1123, 131 Am. St. Rep. 540, it was held that one party could own the land and another the timber growing thereon; the deed to the timber alone conveying no title to the land itself. It was also held that, where the deed conveying the timber contained no limit of time within which the purchaser must remove same, he could do so at his pleasure, and that he thereby obtained an interest in the land to the extent that he had the right to burden same with the support of the timber for an indefinite period of time. In that case the seller could convey what could not be done in the case at bar; that is, the land itself in fee simple.

Since the boards of supervisors have the right to sell this timber, it follows that they have the right to permit the purchaser to enter upon the land and remove same, and necessarily to burden the land with the support thereof until removed; but

they have no right or power to grant him an indefinite length of time for this purpose, for the reason that section 211 of the Constitution prohibits the state from parting with the possession and control of sixteenth section lands except for a definite and comparatively short period of time. Such purchaser, therefore, can only be granted a reasonable time in which to remove the timber, during which, of course, he has the right to burden the land with the support thereof, and to that extent has a right to or interest in the land. Section 2774 of the Code provides: "All alienations and warranties of lands purporting to convey or pass a greater estate than the grantor may lawfully convey or pass shall operate as alienations or warranties of so much of the right and estate in such land as the grantor could lawfully convey, but shall not pass or bar the right to the residue of the estate to be conveyed," etc. The deed in controversy, therefore, conveyed to the purchaser only such right or interest in the land as the board of supervisors could lawfully convey, to wit, the right to burden same with the support of the timber for a reasonable length of time. The question of what constitutes such reasonable time is not presented on this record.

The third ground of objection to the decree of the court below is: "Because the sale was made for such a grossly inadequate consideration as to operate as a fraud upon the inhabitants of the townships interested."

According to the agreed statement of facts, the timber in controversy was worth, in round numbers, the sum of $20,000, or rather, said sum could have been obtained for it "if the board of supervisors had possessed the authority to make a fee-simple title to the entire property, including the soil on which the timber and wood was growing." It also appears from this agreed state of facts: "The price paid by defendant for the said timber and wood were as much as could have been obtained on the market at that time for the same, in view of the facts that it was grow--

ing on sixteenth section lands, the right to cut and remove it was involved in some uncertainty, and the defendant was the owner of the leases." The price paid for the timber was $1,550, inadequate, of course; but it is elementary that mere inadequacy of consideration alone is not ground for setting aside a conveyance of this character. Inadequacy of price must be connected with fraud or other circumstances which tend to bring about such inadequacy before the sale can be set aside by the courts. No other circumstance indicating fraud is alleged in the bill or contained in the agreed statement of facts.

The determination of the price at which such timber shall be sold has been committed by the statute to the boards of supervisors, and in the absence of fraud or collusion the courts cannot interfere with their discretion in the matter. And, moreover, when we remember that these leases had seventy years and more to run, during which time the board could not sell, except to the lessee or with the consent of the lessee, the inadequacy of price is not so great as it would otherwise seem to be.

The decree of the court below is reversed, and cause dismissed.

*Reversed.*

MAYES, C. J., delivered the following concurring opinion.

The principal contention in this case arises out of the alleged unconstitutionality of chapter 41 of the Acts of 1898 and chapter 124 of the Acts of 1904. If the above acts violate section 211 of the Constitution, as is claimed by appellee, then it follows that section 4702 of the Code of 1906, and chapter 220 of the Acts of 1910 must also be declared unconstitutional, as all these acts are practically the same. Before discussing these several acts, it may be well to set out the provisions of section 211 of the Constitution, since that section is the section which it is claimed is violated by the acts in question. It is there provided that:

"The legislature shall enact such laws as may be necessary to ascertain the true condition of the title to the sixteenth section lands in this state, * * * and shall provide that the sixteenth section lands reserved for the support of township schools shall not be sold, nor shall they be leased for a longer term than ten years for a gross sum; but the legislature may provide for the lease of any of said lands for a term not exceeding twenty-five years for a ground rental, payable annually; and, in case of uncleared lands, may lease them for such short terms as may be deemed proper in consideration of the improvement thereof," etc.

Before proceeding to discuss the acts in question, there are several prominent and undoubted purposes sought to be accomplished by this section of the Constitution to which I desire to call especial attention. While it is plain that it is the purpose of the Constitution to forever retain the title to these lands in the trustees, for the use and benefit of the schools, it is also plain that the section contemplated that these lands should be made revenue-bearing, so as to be a benefit to the schools. If the lands were to remain unimproved and unused, it would bar and defeat the very purpose of their donation. After providing that the lands should not be sold, this same section outlines a scheme to be pursued for the improvement of these lands and their utilization; the very scheme outlined by it necessitating the removal of the timber therefrom, in order to accomplish its purpose and to obtain a revenue therefrom. The section provides for the leasing of both the cleared and the uncleared lands. In the case of *Moss Point Lumber Co. v. Harrison County,* 89 Miss. 448, 42 South. 290, 873, we held that the lessees of these lands had the right to clear the lands and remove timber therefrom, and the Constitution contemplates and directs that this very thing be done.

I now come to a discussion of the acts in question as applied

to this section, keeping in mind always that the effectuation of
the scheme directed by the Constitution for the utilization of
these lands compels the removal of the timber.  The first act
was passed in 1898, and is chapter 41, p. 62.  That act em-
powered the board of supervisors "to sell the merchantable pine
timber and wood on such lands, or to lease said lands for tur-
pentine purposes for a term not exceeding one year."  The next
act was passed in 1904, and is practically the same as the act
of 1898, except a little broader.  This last act empowers the
board of supervisors "to sell the merchantable timber of any
and all varieties, and wood on such land, or to lease for a ·term
of not exceeding three years said lands for turpentine purposes,
or pasture purposes for a term not exceeding one year."  The
next act was placed in the Code of 1906, becoming section 4702,
and is identical in its language with the act of 1904.  The next
act was passed by the legislature of 1910, being chapter 220,
p. 220, and is practically the same as the former acts, but a
little broader, in that this last act also authorizes the sale of
gravel and acid iron earth.

It may not be amiss to note the fact that the distinguished
commission, consisting of former Chief Justice WHITFIELD,
Thos. C. Catchings, and W. H. Hardy, appointed under
chapter 100, Acts 1904, "to revise, arrange, and classify all
the statute laws of this state into one Code," adopted and
approved the acts under discussion in the very language that
they are now found in the same.  This is shown ·by section
4150a of their report to legislature, called the "Dummy Code,"
which contains the laws recommended by them to the legislature
of 1906 for passage, and, as indicated above, this section was
passed.  In the concurring opinion of Chief Justice WHITFIELD
in the case of *Moss Point Lumber Co. v. Harrison County,* 89
Miss. 448, 540, 42 South. 873, the constitutionality of these
acts is again recognized by him.  It is there stated by him that,

"if sales of timber are best in some cases, let the legislature authorize the sale, as it did by the act of 1904." Of course, I use the above as illustrative of the view that the legislature and the court had of the constitutionality of these laws from the time they were passed until the institution of this suit.

Our court has always held that all doubts or uncertainties arising either from the language of the Constitution or the act must be resolved in favor of the validity of the act, and the court will only assume to declare it void in case of a clear conflict with the Constitution. The duty of the court is to so construe the acts of the legislature as to uphold their constitutionality and validity if it can be reasonably done, and if their construction is doubtful the doubt will be resolved in favor of the law. *State v. Henry,* 87 Miss. 125, 40 South. 152, 5 L. R. A. (N. S.) 340; *Beck v. Allen,* 58 Miss. 143; *Burnham v. Sumner,* 50 Miss. 517; *Virden v. Bowers,* 55 Miss. 1; *People v. McBride,* 234 Ill. 146, 84 N. E. 865, 123 Am. St. Rep. 82; *Hart v. State,* 87 Miss. 177, 39 South. 523, 112 Am. St. Rep. 437. It is my judgment that these acts of the legislature but answer the command made on it by section 211 of the Constitution, and provide for the utilization of that which constitutes the possible revenue of the land. The timber must be destroyed in order to carry out the constitutional scheme and instead of leaving it standing on the land, to be utilized or destroyed by the lessees, the legislature but planned a method to conserve all values in the land for the use of the schools.

If the contention of appellee in this case be correct, let us see what the result would be. Take, first, a tract of land that could not be leased, because not susceptible of cultivation, but still well timbered. If the legislature had no power to authorize the sale of the timber, land so situated would be of no use to the schools whatever, and the timber must be left to stand, subject to the ravages of the storm, the forest fires, and the depredator. It

could never be used, and its value must be lost, though the title to the soil is to remain in the trustees forever, and the removal of one growth of timber would be supplied in time by another, thus creating successive crops and continued revenue. Can it be supposed that so intelligent a body of men as composed our last convention involved themselves in such folly? The whole section of the Constitution shows that it contemplates the use of the lands for the purpose of revenue, and does not contemplate stifling and defeating the very object of the donation of the lands for school purposes, which was to obtain revenue therefrom.

Again, let us take another illustration. Suppose a fertile tract of land, well timbered and desirable for agricultural purposes, the rental value of which, when put in cultivation, would produce a good annual revenue. The board of supervisors desire to utilize this land and have it put in cultivation. If they cannot sell the timber, thus getting its value, they must let the land stand in its natural state, unimproved, or they must lose the value of the timber by leasing the land and permitting the timber to be destroyed by the lessee in clearing the land. The contention of appellee resolves itself into this simple proposition, and that is: The trustees must submit to the destruction of the trees, the natural yield of the soil, if the school lands are to do the schools any good, or they must refuse to lease at all, and leave the lands useless for the purpose for which they are intended. To uphold the construction as contended for by appellee involves a conviction of the constitutional convention of folly in their dealing with these lands.

Soon after the adoption of the Constitution the legislature placed this construction on same. In fact, four different and successive legislative assemblies have placed the same construction on the Constitution, and whatever force may be gathered from legislative construction is entitled to great weight here. It will not do to close one's eyes to the whole of section 211, and

its objects, and to say, because the section in question says that the "sixteenth section lands" shall not be sold, and because this court has held that in some instances "land" includes trees, it therefore follows that the term here is also meant to include trees.    In arriving at the sense in which the word "land" is used in section 211, the whole section and its purposes are to be.taken into consideration.    It is quite true that this court has held that the term "lands" includes trees.    See case of *Harrell v. Miller*, 35 Miss. 700, 72 Am. Dec. 154; *McKenzie v. Shows*, 70 Miss. 388, 12 South. 336, 35 Am. St. Rep. 654; *Nelson v. Lawson*, 71 Miss. 819, 15 South. 798; *Walton v. Lowrey*, 74 Miss. 484, 21 South. 243; *Fox v. Lumber Co.*, 80 Miss. 1, 31 South. 583; *Butlerfield Lumber Co. v. Guy*, 92 Miss. 361, 46 South. 78, 15 L. R. A. (N. S.) 1123, 131 Am. St. Rep. 540. Ordinarily this is true, and in the cases in which this has been held there can be no doubt as to the correctness of the court's holding.    An inspection of the various cases cited above, how-. ever, shows that the question usually arose in a controversy as to the application of the statute of frauds in making a conveyance of same, or upon a contest growing out of a homestead right, or upon a question of taxation, where the trees were owned by one person and the soil by another.

In all of the above cases it was, and it should have been, the policy of the law to give the broadest significance to the use of the term "land."    There would be no reason to depart from this construction, even in applying it to section 211 of the Constitution, if it was not apparent that it was the purpose of the section to use it in its more restricted sense.    The term "land" has no such significance in the law—no such fixed and unvarying meaning as that it cannot be changed by constitutional provision or legislative enactment.    I am satisfied that the Constitution dealt with the title to the soil only.    It prohibited any enactment of any law by the legislature that had for its purpose

the divestiture of title to these lands, and this alone constituted the only limitation that it was ever designed to place on the authority of the legislature to obtain revenue from these lands. Of course, the time in which leases may run is also limited; but we are not considering that feature of the Constitution.

ANDERSON, J., delivered the following dissenting opinion.

The clause of section 211 of the Constitution providing that the sixteenth section lands shall not be sold is not open to construction. Its meaning is plain and unambiguous. The term "land" has long had a well-settled definition in law. There can be no misunderstanding of its meaning under the decisions of this court, beginning back before the adoption of section 211, which hold as follows: In *Harrell v. Miller,* 35 Miss 700, 72 Am. Dec. 154, that the term "land" embraced, not only the soil, but its natural produce growing upon and affixed to it, such things are a part and parcel of the realty and pass by grant of the land, and therefore the sale of growing timber on the land is within the statute of frauds and must be in writing; *McKenzie v. Shows,* 70 Miss. 388, 12 South. 336, 35 Am St. Rep. 654, that growing trees are a part of the realty, and the conveyance by the husband of all the merchantable timber on his homestead is an incumbrance of such homestead, and void if it is not joined in by his wife; *Nelson v. Lawson,* 71 Miss. 819, 15 South. 798, that a verbal contract for the sale of growing timber is void as to trees standing on the land, and if these are removed over the owner's objection he may maintain replevin for the timber into which they are converted; *Walton v. Lowrey,* 74 Miss. 484, 21 South. 243, that a parol agreement authorizing the cutting of standing timber on lands is within the statute of frauds and must be in writing; *Fox v. Lumber Co.,* 80 Miss. 1, 31 South. 583, that growing trees are part of the real estate, and subject to separate ownership from the soil, and where the soil

belongs to one person and the trees upon it to another they may be separately assessed for taxation to their respective owners; *Butterfield Lumber Company v. Guy,* 92 Miss. 361, 46 South. 78, 15 L. R. A. (N. S.) 1123, 131 Am. St. Rep. 540, that the sale of the standing timber conveys an interest in the realty, and that the owner of the land in fee may convey to another a fee-simple title to the standing timber thereon; *Lumber Co. v. Harrison County,* 89 Miss. 448, loc. cit. 529, 42 South. 290, loc. cit. 302, that to permit a tenant of a particular estate in land to remove the timber without compensation to the estate is illegal, "for he takes in that case not the product of the estate arising in his own time, but he takes that which nature has been elaborating in all ages, being a part of the inheritance itself, and that, too, which imparts to it its chief value."

The definition of "land" is also fixed by our statutes, beginning with section 15, Code 1880, before the adoption of section 211 of the Constitution, and coming down with sections 1507, Code 1892, and 1584, Code 1906, which provide in varying language that the term "land," when used in any statute, includes corporeal hereditaments and any interest or estate in the land. This is no new doctrine, as the following quotations from Coke and Blackstone show: "It is elementary that 'land' itself in legal contemplation extends from the sky to the depths. 'The term "land" includes, not only the ground or soil, but everything which is attached to the earth, whether by the course of nature, as trees, herbage, and water, or by the hand of man, as houses and other buildings; and it has an indefinite extent upwards as well as downwards, so as to include everything terrestrial under or over it.'" Coke, Litt. 4a. "Land comprehends all things of a permanent and substantial nature being a word of very extensive signification; also, if a man grants all his lands, he grants all his mines of metals, and his fossils, his woods, his waters, and his houses, as well as his fields and meadows." 2 Bl. Comm. 16–18.

This court had laid down well-defined rules for ascertaining the meaning of the Constitution: "The Constitution is a law, differing from a statute, as it is of superior and paramount force, irrepealable by the legislature, and which prevails, where it conflicts with a statute. When the framers of the Constitution employ terms which, in legislative and judicial interpretation, have received a definite meaning and application, which may be more restricted or general than when employed in other relations, it is a safe rule to give to them that signification sanctioned by the legislative and judicial use." *Daily v. Swope*, 47 Miss. 367; *Hawkins et al. v. Carroll Co.*, 50 Miss. 758. "To the courts only is the authority given to determine this [the constitutionality of a statute], and great caution should be and always is exercised by them in such delicate inquiries. Otherwise, instead of being the final refuge of liberty, they would be its grave. Loose construction would eventually mean ruin. Another principle to be carried along is that, if the language be plain, the announcement must enforce it, to whatever evil it may apparently lead; and a state legislature is an absolute despot, its acts on all subjects being free from any restriction whatever not found in the state or federal Constitution. Congress has no power not confided to it. A legislature has all power not withheld from it. Another principle is that, where the Constitution deals with a subject, its words must be the sole boundary, and sacred from the legislatures, except where it permits, expressly or by necessary implication. Another is that, where the Constitution schedules powers, giving or taking away, it must be presumed to have scheduled all, and it only must be looked to, with its necessary implications, for the limit of authority or restriction. Still another is that, where the language is plain, subsequent action by the departments, or contemporaneous or antecedent history of the subject, cannot be appealed to for interpretation." *State v. Henry*, 87 Miss. 125, 40 South. 152, 5 L. R. A. (N. S.) 340.

I agree that the rule is all doubts must be resolved in favor of the constitutionality of the statute; but that rule has no application here, because there is no doubt. There is no room to inquire into the purpose of the framers of this section of the Constitution. It provides in plain and unmistakable terms that the sixteenth section lands shall not be sold. There is nothing in the section to indicate that the term "lands" is used in any other than its well-defined legal sense, which means not only the soil, but trees standing thereon. In 1890, when the Constitution was adopted, the timber lands of Southeast Mississippi were of little value, either for their timber or for agricultural purposes. The provision authorizing the legislature to lease sixteenth section lands in consideration of their improvement clearly has reference to lands valuable principally for agricultural purposes, and not to those in Southeast Mississippi, which have no value except for the timber standing thereon. The timber cannot be sold, because in selling the timber the land is sold, one being a part and parcel of the other; and here all the value of the land will be gone, because the timber interest is all there is of it of any value. The Constitution has scheduled the powers of the legislature with reference to the sixteenth section lands, giving and taking away; and in the language of Judge CALHOON, in *State v. Henry, supra;* "It must be presumed to have scheduled all, and it only must be looked to, with its necessary implications, for the limit of authority or restriction." There is the general inhibition against sale, followed by the clause permitting lessees to remove the timber in order to improve for agricultural purposes. This excludes any other method of disposing of the timber. This is the limit of the power of the legislature with reference to the timber.

This court has nothing to do with the question of the wisdom of the constitutional provision in question, or what is to the best interest of the school children. The Constitution itself settles

that in plain language. However, if it were proper to go into that question there are two sides to it. In *Lumber Company v. Harrison County, supra,* this court held that the ninety-nine-year lessees of the sixteenth section lands, in cutting and selling the merchantable timber therefrom, were guilty of waste; such lessees under their leases acquiring the right alone to remove the timber for agricultural purposes. By this decision that great domain of wealth, the standing timber on sixteenth section lands in Southeast Mississippi, was thought to be preserved for the school children; such lessees having paid practically nothing for their leases.

Now the effect of that decision is nullified, because those same lessees, by the decision in the instant case, may purchase all of the standing timber at very much less than its value, because others who might desire to purchase would refrain, in view of the fact that they would not have the right to remove the timber until the expiration of the leases. If expediency is to be considered, the thing to do is to let this timber stand until the expiration of the leases, and then amend the Constitution, permitting its sale. By that time, in all probability, it will constitute a great mine of wealth, sufficient to maintain the township schools for all time.

Section 4702, Code 1906, which authorizes the sale of the timber on these lands by the boards of supervisors, contains no restriction as to the title which may be conveyed. If this statute is not violative of section 211 of the Constitution, it authorizes a sale of the standing timber in fee. In the instant case such a conveyance of the timber is made; the deed being substantially the same as the deed in *Butterfield Lumber Company v. Guy, supra,* which was held by the court in that case to convey a fee-simple title to the timber. So you have on the one hand, under section 211 of the Constitution, no power to sell soil itself (which is of little value), and, on the other, you have the power, under

the same constitutional provision, to sell the timber in fee, which constitutes practically all the value there is in the land. It is not conceivable to mè that the framers of the Constitution intended that the soil should not be sold, while the standing timber on it, consisting practically of all its value, might be. When you sell the timber, you sell all.