MATTHEWS *et al. v.* PANOLA-QUITMAN DRAINAGE DIST.

(Division B.  November 17, 1930.)

[130 So. 910.  No. 28850.]

**Royden Dixon,** of Memphis, Tenn., and **Boone & Lowrey,** of Marks, for appellants.

**Lowrey & Lamb**, of Marks, for appellee.

Argued orally by **Royden Dixon** and **M. P. Lowrey**, for appellant and by **Lomax B. Lamb**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

The Panola-Quitman drainage district was organized under the provisions of chapter 195, Laws 1912, as amended by chapter 269, Laws 1914. The final decree establishing the district was rendered on February 26, 1923. On September 5, 1923, the district commissioners

filed, as required by law, their assessment roll of benefits. By this roll there was a heavy assessment of benefits against a large tract of land owned by appellants, which assessments were expressly spread out in annual installments over the series of years beginning with 1924 and ending with 1952. Thereafter, on January 1, 1924, the district issued its drainage district bonds in the sum of one million five hundred thousand dollars maturing serially from April 1, 1929, to April 1, 1953. After the issuance of said bonds, appellants cut and removed from their said lands a large amount of timber, alleged to have been of the value of twenty thousand dollars, and the drainage district has sued appellants, by way of an attachment in chancery, for the value of said timber, on the alleged ground that there was a drainage district lien on the timber as a part of the land, and that the timber could not be removed except by first discharging the full amount of the assessments levied on the land on which the timber stood at the date of the issue of the bonds.

The central and controlling purposes for which drainage districts are organized are well known, but the necessity to resort to common knowledge in respect to the said purposes is removed in this case by the express language of the cited act of 1914, and particularly by the definite recital in section 2 thereof, that such districts are established "for the promotion of public health and for agricultural purposes." That the public health is promoted by the drainage is, of course, obvious; and it is equally obvious that lands cannot be put to agriculture until the timber is removed.

Nevertheless, the drainage district relies on section 7, as amended by section 6 of chapter 269, Laws 1914, which provides that, "the assessment shall embrace not merely the land, but all railroad and other improvements on lands which will be benefited by the drainage system,"

and on section 9 as amended by section 8, that "the assessment or assessments so levied shall be a lien on all of the real property of the district from the time that the same is levied," and on section 24 as amended by section 14, which provides "that all bonds and evidences of indebtedness issued by the commissioners under the terms of this act shall be secured by a lien on all lands, and railroads subject to taxation under this act," and on the further well-settled meaning of land or real estate as embracing all timber standing or growing thereon.

Appellants call attention to the aforementioned expressly stated objects of the drainage act and to the entire contents, scope, and purpose of said chapters, and particularly to section 9 as amended by section 8 of said chapter 269, Laws 1914, which provides: "And which said assessments are to be paid in annual installments, not to exceed ten per cent (10 per cent) in any one year, as provided in such order, but if any landowner elects he may pay the whole amount of the assessment against his land before it becomes due, or at any time thereafter, or all or any part of said assessment at any time he sees fit, provided such payment is made before any bonds are issued by the district." Thus, as appellants show, the privilege of paying the assessments except by annual installments, as provided in the assessment order, during the life of the bonds is expressly cut off after bonds have been issued; and appellants point out that there is no provision whatever for any person or any official or other agency to receive the assessments in advance, and to discharge the lien, after the issuance of the bonds.

We are therefore plainly confronted, under the contention of the drainage district, with the proposition that although the central and dominant purpose in the creation of the district was to promote agriculture, yet the law under its letter must be held to operate in the very opposite direction in preventing the timber from being lawfully removed until the maturity of the bonds in 1953,

now still twenty-three years in the future; in other words, that agriculture must remain at a standstill for nearly a quarter of a century because the timber cannot be lawfully removed before that time. The contention involves the further proposition that all sawmills, all woodworking establishments, or furniture factories, and the like, would have to cease operations on any of these lands, and we suppose it would also be contended on the same principles that no minerals discovered in the land, or oil or gas, could be removed until the long lapse of time mentioned had passed into history.

Moreover, as the court must know from the common facts of nature, there is much valuable timber, such as cypress and the like, which must have water for its continued life and growth. When the water is drained from the swamp lands, this class of timber soon deteriorates and finally dies. Can it be possible that the owner must stand helplessly by and see his property go to destruction and he can do nothing to save it? If the contention of appellee be sound, he could do nothing except by a violation of the law; that is to say, he must violate the law by removing the timber, and then be sued for saving his own property—he can arrive at his just and natural rights only through the means of the active commission of a wrong.

We cannot ascribe to the legislation in question the purpose or deliberate intention to produce any such paralyzing and indefensible consequences, but rather that the members of the lawmaking body would instantly have shrunk from the mere suggestion of the contention here made. Fortunately, the course for us to follow is already charted in that taken by the court in L. N. Dantzler Lumber Co. v. State, 97 Miss. 355, 53 So. 1. In that case it was contended that the timber on the sixteenth section lands could not be removed or disposed of in any way for commercial purposes because section 211 of the constitution expressly provided that "the sixteenth sec-

tion lands reserved for the support of township schools shall not be sold;" the point being, as in this case, that the timber is a part of the land, and in consequence within the constitutional prohibition. There the court pointed out as insuperable facts that unless the timber could be removed it could not be used, and until removed the land could not be used, and it was therefore held that the timber, although within the letter, was not within the purpose of the constitutional provision. We follow that case and apply it to the dilemma presented by the present appeal; and we hold that it was not within the legislative purpose—and therefore is not within these drainage acts —to prevent the removal of the timber at any time and for any purpose desired by the owner, and this, too, without any payment of the installments of assessment to become due on the land subsequently to the removal.

Reversed and remanded.