COVINGTON *et al. v.* MELETIO *et al.*

(Division B. Jan. 8, 1934. Suggestion of Error Overruled Feb. 5, 1934.)

[151 So. 735. No. 30949.]

Thos. G. Hopkins, of Louisville, for appellants.

E. M. Livingston, of Louisville, for appellees.

500

Argued orally by **Thos. G. Hopkins**, for appellant.

**Griffith, J.,** delivered the opinion of the court.

An original and two amended bills were filed in this case; demurrers were sustained; and, upon sustaining the demurrer to the second amended bill, the court dismissed the cause finally. It has been exceedingly difficult to determine from these bills what exactly are the facts and what precisely is the basis for the relief which complainants are seeking. Apparently, however, the situation presented is, in brief, about as follows:

The Tallahaga drainage district in Winston county was created in 1919, and a bond issue of one hundred twenty-five thousand dollars was sold to cover the expenses of the special drainage improvements. Of these bonds about one hundred thousand dollars remains outstanding, and of this amount the defendants own approximately ninety-six thousand dollars. The drainage district comprises an area of twelve thousand five hundred thirty-seven acres. On May 4, 1925, about six thousand nine hundred acres of this land was forfeited to the district for the nonpayment of the drainage assessments due thereon for the year 1924. However, on April 7, 1925, the same lands had been sold to the state for the delinquent state and county taxes. No question is raised as to the validity of the aforesaid sales to the district and to the state, and for that reason we do not pause to inquire into it.

Early in April, 1927, and a few days before the tax title to the six thousand nine hundred acres would mature in the state, the defendants visited Winston county to see what could be done to prevent the maturity of title in the state to this large acreage of land. After viewing the situation, and it being obvious that the delinquent owners of the six thousand nine hundred acres had determined to abandon them, it was agreed by the commissioners and the defendants that the defendants would take over the public obligations of the said delinquent lands and would pay all the taxes and drainage assessments in arrears, and would in the future continue to pay the same, provided that, in consideration therefor, the defendants should have the title of the delinquent owners, which title was then about to be finally abandoned by the owners in consequence of the immediately impending maturities of said sales for delinquent taxes and improvement assessments. In accordance with this agreement, the commissioners, on April 4, 1927, made a

deed to the six thousand nine hundred acres to the defendants. The authority for this deed was entered on the minutes of the commissioners, the minutes reciting that the deed was to be ''for the following consideration, to-wit: The amount of the drainage tax payable in the year 1924 assessed against said lands, same being the consideration paid by this district for said lands in its purchase thereof.'' In further pursuance of the complete agreement, the defendants immediately after the maturity of the title in the state purchased the state's title, and defendants have paid all ad valorem taxes and all drainage assessments on the six thousand nine hundred acres, not only all those in arrears, but all those since accruing down to this date. The defendants have paid the drainage assessments by the use of the past-due interest coupons taken from their bonds.

The bills in this case were filed by the present drainage commissioners, and in some sort of way there seems to be a contention, left, however, somewhat in the background, that the deed made by the drainage commissioners was in fact in consideration of the cancellation by defendants of a large amount of the bonds then held by the defendants. We have already quoted from the minutes of the commissioners what that consideration was. Moreover, no title had matured in the district at the time. What was done was in legal effect a redemption by the defendants of the sale to the district, and the defendants had a right as parties in interest to redeem. They did not have to pay anything but the redemption money, or its equivalent, to exercise that right. Any agreement to pay or surrender anything further would be without legal consideration; but, aside from this, it is fairly clear that defendants have carried out the only agreements they made.

It seems also that it is supposed that relief of some character ought to be granted here out of an apprehension that the defendants, having purchased the state's

forfeited tax title to the six thousand nine hundred acres, may later take the position that these lands are no longer subject to the drainage taxes or assessments. To this it is answered that drainage assessments are merely suspended while the state holds the forfeited tax title to drainage lands. When they return to private ownership, the purchasers from the state must pay the drainage assessments. This follows upon the same reasoning and upon the same principles applied by this court in the recent cases, Howie v. Panola-Quitman Drainage Dist., 151 So. 154, and Seward v. City of Jackson, 165 Miss. 478, 144 So. 686.

The commissioners complain that valuable timber on the six thousand nine hundred acres owned by the defendants has been cut and removed by them, and that this work is still going on. Complainants bottom their bill upon the averments that the defendants own these lands, and yet question the right of the defendants to use them as other owners may do. The defendants are within their legal rights in this respect, as was held by this court in Matthews v. Drainage Dist., 158 Miss. 647, 130 So. 907.

The main contention of the commissioners, as best we can gather from the bills, is that, when the defendants acquired title to the six thousand nine hundred acres from the state, this operated to retire an amount of the bonds held by the defendants in the same proportion as the six thousand nine hundred acres bears to the twelve thousand five hundred thirty-seven acres in the district; that, in consequence, the bonds held by defendants should be called in and canceled in said proportion; that this cancellation should be made to relate back to the time of the acquisition by defendants of the state's title to the six thousand nine hundred acres; and that the defendants should be made to pay in cash an amount equal to the interest coupons on the canceled bonds in so far as said in-

terest coupons have been from year to year used by defendants to pay the drainage assessments on said six thousand nine hundred acres. In brief, it is the contention of the commissioners that, when the defendants, owning a large proportion of the bonds, acquired the fee-simple title to the six thousand nine hundred acres, there was a merger of the incumbrance represented by the bonds with the title thus acquired by defendants, and that thereby, as a matter of law, bonds in the proportionate amount heretofore stated automatically disappeared as obligations of the district.

To state the said contention of the commissioners is all that is necessary to show that the point is not well taken and cannot be maintained. If the defendants owned all the lands and all the bonds, there would be a situation wherein the bonds might well be surrendered for cancellation upon consideration of the discharge of all assessments to pay them. But the defendants do not own all the bonds nor all the lands. Or, if the position of the commissioners was that the cancellation of the bonds held by the defendants in proportion to the lands owned by them would be upon the basis of the release of these lands of the defendants from any further drainage assessments to pay outstanding bonds, then there might be fairness in the proposal; but the position taken by the commissioners is that about half of defendants' bonds shall be canceled, and yet their six thousand nine hundred acres of land shall continue to be assessed to pay the other half, some of which defendants do not own. The proposal is that by a decree of court the drainage district debt shall be cut in half, because those who own a large proportion of the bonds own one-half of the lands of the district, with the result that those who own the other one-half of the lands would have to pay on the basis of only one-half of the existing debt of the district, and with the ultimate result that defendants would lose nearly three-

fourths of whatever value their bonds may have. The proposal as made by the bills contains no merit, except that of originality and ingenuity, and the chancellor was correct in dismissing them.

Affirmed.