BOARD OF SUPERVISORS ADAMS COUNTY, et al. *v.* GILES, et al.

Dec. 14, 1953

No. 39006 46 Adv. S. 2 68 So. 2d 483

246

*R. L. Netterville, Chas. F. Engle, Fred C. Berger,* Natchez, for appellants Board of Supervisors of Adams County.

*Matthew Harper, Jr.,* Asst. Atty. Gen., Jackson, for appellants W. L. McGahey, State Land Commissioner, and the State of Mississippi.

*Brandon, Brandon, Hornsby & Handy,* Natchez, for appellees.

250

Lᴇᴇ, J.

James S. Giles and others brought this suit in the Chancery Court against the Board of Supervisors of Adams County and others. The complainants are the owners of Clermont Plantation, which consists of Sections 4, 6 and 14, Township 7 North, and Section 21, Township 8 North; all in Range 3 West, in Adams County, Mississippi. Fractional Section 5, Township 7 North, Range 3 West is school land, in lieu of Sixteenth Section. These lands abut on the Mississippi River. For more than one hundred years, accretions known as batture

and alluvion have washed against and upon these lands, and have become attached to them. The suit in fact involved the location of the line between the school land and Clermont Plantation, with the consequent determination of the relative interests of the parties in the accretions.

The primary issue for determination was whether or not two contracts, of date of June 7, 1910 and May 9, 1951, between the complainants and their predecessors in title and the Board of Supervisors of Adams County, which attempted to fix the lines and apportion the accretions between the parties, are valid and binding.

Original and amended bills of complaint were filed. To them were attached, as exhibits, copies of the contracts, and maps describing the areas affected, and detailing the method by which the apportionment of accretions was arrived at, and an abstract of title to Clermont Plantation, made and certified to by Brandon & Brandon, Attorneys of Natchez, Mississippi, on April 5, 1933, and which included the original grants and conveyances prior to the date of the certificate. It was alleged that the agreement of June 7, 1910, was validly entered into between the complainants and their predecessors in title and the board of supervisors in order to establish the boundary between these lands for the purpose of apportioning the accretions. It was further alleged, and the contract showed: that O. M. Fowler, county surveyor, and E. B. Geddes, surveyor, representing the board and the complainants, respectively, arrived at the location of the lines of division; that there was "A township and plantation map of Adams County, Mississippi, of 1902, compiled from title and surveys by Chas. W. Babbitt, county surveyor, under ordinance passed in May 1902, by the board of supervisors" on file in the chancery clerk's office; that it showed Clermont Plantation and school Section 5, and the East bank of the Mississippi River as of 1847, as ascertained by the U. S. Deputy Surveyor Bradford and formation of batture

and sand bar existing at the date of the map, and which was substantially as then existing; that such map was used as the basis of calculation; that by scaling the map, Geddes and Fowler calculated the entire frontage of Clermont Plantation, and Section 5 upon the bank of the Mississippi River in 1847—detailing the method thereof—and ascertained the portion of the river front between those points, which belonged to Section 5 and to Clermont Plantation, and the entire distance along the water line; that from the calculation so made, the surveyors ascertained and located a point on the new water front so as to apportion to Section 5 the same proportion of the new front as it had of the water front in 1847, and likewise, to Clermont Plantation; and that the part of the accretions belonging to Section 5 was indicated between two parallel lines on the map. The report of the surveyors and the agreement thereon were approved by Brandon & Brandon and Ernest E. Brown, Attorneys for the complainants and the board, respectively. The contract itself stated that W. H. Ratcliff, as President of the Board, executed the same by authority of a resolution of the Board, adopted at a regular meeting on June 7, 1910, and duly recorded on the minutes of that meeting. The abstract quoted an order on the minutes of May 7, 1910, which recited the presentation, reading, consideration, receipt and filing of the report by Ernest E. Brown, and Reed and Brandon. The abstracter certified that ''the report referred to is not itself spread upon the minutes of the Board''; but he set out the following order as appearing on the minutes of the Board of date of June 7, 1910, to wit: ''IN THE MATTER OF THE DIVISION AND APPORTIONMENT OF ACCRETIONS ON THE MISSISSIPPI RIVER IN FRONT OF THE 'CLERMONT' PLANTATION OF THE GILES HEIRS IN T. 7 N., R. 3 W., AND T. 8 N., R. 3 W., AND SCHOOL SECTION 5, IN T. 7 N., R. 3 W., IN ADAMS COUNTY, MISSISSIPPI: Whereas: In pursuance of report and

agreement between Emma H. Geddes, James S. Giles, and Thomas D. Giles, by Reed and Brandon, their attorneys, of the first part, and by the Board of Supervisors of Adams County, by Ernest E. Brown, their attorneys, of the second part, dated April 15th, 1910, and filed with the Clerk of the Chancery Clerk as part of the records of said Board on May 5th, 1910, there has been prepared and presented for ratification and approval by said Board, a plat or map made by O. M. Fowler, County Surveyor, and E. B. Geddes, Surveyor, showing said apportionment in accordance with said agreement and report and an indenture intended to carry into effect said agreement and division between all the parties above mentioned,—Now Therefore: Be it Resolved: That said report, map or survey, and apportionment of accretions therein shown, and said indenture carrying the same into effect be and the same are hereby approved, ratified, and confirmed; and that W. H. Ratcliff, president of the Board of Supervisors of Adams County, Mississippi, be and he is hereby authorized, empowered, and directed to execute said indenture and that John F. Jenkins, Chancery Clerk, attest the same. Ordered this the 7th day of June, 1910.''

It was also alleged that the lines so established thereunder have been recognized ever since; that on November 10, 1950, the board executed an oil, gas and other mineral lease to Humble Oil & Refining Company; that on May 9, 1951, complainants and the board of supervisors entered into an agreement whereby the agreement of June 7, 1910, was recognized as having been made, and whereby a division and apportionment of the accretions, batture and alluvion which have formed since June 7, 1910, was made in accordance with the survey and map of Francis N. Geddes and Paul C. Montgomery, surveyors and engineers of the complainants and the board, respectively, and with the advice of counsel, Brandon, Brandon, Hornsby & Handy and Ben Chase Callon, the

respective attorneys for the complainants and the board. A copy of this instrument was made an exhibit. It showed the method by which Geddes and Montgomery determined the lines, namely, by projecting the lines of the survey and boundary, which were established by the contract of June 7, 1910. And it was alleged that, in doing so, an equitable apportionment of the accretions since 1910 was made. The instrument itself recited that it was executed by R. E. Enochs, President, and attested by Walter P. Abbott, Chancery Clerk, pursuant to a resolution of the Board of Supervisors of Adams County, adopted on May 9, 1951, and duly recorded on the minutes of that meeting. It was further alleged that the instrument was entered into at the instance and request of the board of supervisors, ''all as shown by the minutes of the board of supervisors of said Adams County, Mississippi.''

It was further alleged that Humble Oil and Refining Company thereafter raised a question as to the validity and legality of the contracts of June 7, 1910, and May 9, 1951; and that, after conference, the board of supervisors requested the institution of a suit to cancel clouds as to the batture, alluvion and accretions which had formed on these lands, and to have the partition and division agreements ratified, approved and confirmed.

The prayer was for an adjudication that the property lines, first, as of June 7, 1910, to the extent that the accretions had at that time been formed, and secondly, as of May 9, 1951, to the extent that accretions had formed since 1910, had been fixed and established by the contracts and agreements of those dates; but that, alternately, if the two contracts are not valid and binding, then the court would adjudicate what lands are accretions to the mainland properties of the parties, and apportion and divide them accordingly.

The Land Commissioner, W. L. McGahey, intervened by the Attorney General, and he and the board of super-

visors filed a special demurrer, setting up a number of grounds, but which may be condensed into the following reasons: (1) The two agreements are violative of Section 211, Constitution of 1890, which prohibits the sale of Sixteenth Section lands; (2) they were not placed on the minutes of the board, and are void on that account; (3) the method of apportionment, under the agreements, was contrary to the law and was so arbitrary as to be void, and hence, the method being arbitrary and unjust, the apportionment thereunder amounted to a donation and was in violation of Section 95, Constitution of 1890; and (4) the agreements are void because the land commissioner was not a party to them.

 It is of course elemental that the demurrer admitted the truthfulness of all allegations of fact well plead in the original and amended bills and in the exhibits thereto.

Such allegations, if true, were sufficient to show and charge that the board of supervisors, on June 7, 1910, after having previously appointed its surveyor to collaborate with the surveyor for the complainants, and after such representatives of the parties had made maps of the lands, together with the accretions, batture and alluvion, and fixed and determined the lines and boundaries between the lands of the parties, and had filed their report thereof, and after such report, approved by its attorney and the attorneys for the complainants, was presented, received, read and considered by the board, it thereupon, by a resolution duly adopted and spread on the minutes, approved, ratified and confirmed the report, map and apportionment, and authorized, empowered and directed the president to execute the agreement and the chancery clerk to attest the same. As to the agreement of May 9, 1951, it was entered into at the instance of the Board, as was shown by its minutes. Consequently the valid existence of the contracts, so far as this case is concerned, must be conceded.

The appellants assigned and have argued here the same reasons which were set out in their demurrer, and which have been condensed and set out herein above.

The first question then is whether or not such agreements are violative of Section 211, Constitution of 1890, which prohibits the sale of Sixteenth Section lands.

 Of course Sixteenth Section or lieu lands cannot be sold. But this was not a sale. On the contrary, the purpose in the execution of these agreements was to fix the lines between the school land and Clermont Plantation. Section 211, supra, which prohibits the sale of such land, also enjoined it upon the Legislature to ''enact such laws as may be necessary to ascertain the true condition of the title'' to such land. Chapter 129, Code of 1906, was a compliance with that constitutional mandate. Section 4695 of that chapter provided for the investigation and establishment of titles. And Section 4698 thereof, under the heading, ''Suits to establish title and settle disputes'' made it the duty of the boards of supervisors to institute and prosecute to effect all necessary suites to establish and confirm such titles. Sections 4695 and 4698, supra, are now embraced, in all substantial respects, in Section 6594, Code of 1942.

Now in Yazoo County v. Richardson, et al., 75 So. 59, as reviewed and reported in Yazoo County v. Falkner, et al., 209 Miss. 641, 48 So. 2d 137, the appellees there averred that the board of supervisors was about to file a suit to establish the boundary line between Sections 9 and 16, '' * * * when 'all of the parties made an agreement whereby J. A. Hammack was selected to make a survey and establish the boundary; that Hammack made the survey and staked out the boundary; and that it was the true boundary.'' The county denied that the agreement was entered into, that it had authority to make such agreement, or that Hammack made a true survey or established the true boundary. But the Court found that the parties entered into the agree-

ment for the survey, its decree saying, "that the agreement dated May 16th 1914 between the parties is binding on all the parties, and that Hammack marked out the line between said Sections 9 and 16 under said agreement and in accordance with the same," and awarded possession accordingly. The decree in that cause, on appeal here, was affirmed without an opinion. The Court thus held, in effect, that, when uncertainty exists as to the line between Sixteenth Section and other lands, the board of supervisors has the authority to agree with its disputants to the appointment of a surveyor to make a survey and establish the line. Such was the appraisal of that question, when in Yazoo County v. Falkner, supra, the Court said: "Another contention by the appellant is that the doctrine of res judicata does not apply in this case. To that we say simply that the *Court, in the former case, adjudged that the agreement between the board of supervisors and the Richardsons and the Childresses for the appointment of a surveyor to run the line was binding. That meant, of course, that the board had the authority and power to make the agreement.*" (Emphasis ours.)

It is true that the parties in ratifying, approving and confirming the agreements whereby the line was established and the accretions were apportioned, also conveyed, quitclaimed and released respectively to each other any interest they might have held in the lands of the other prior to the apportionment. There was, however, no provision to that effect in the order of June 7, 1910, as spread on the minutes; and reference to the order of May 9, 1951, cannot be made, in this particular, inasmuch as a copy thereof does not appear in this record. But if the line was established and agreed upon, obviously the lands of the respective parties were on opposite sides of that line. Consequently the use of the words *conveyed, quitclaimed and released* was mere surplusage, and would not make a sale out of the

establishment of a line. Since there was no sale, there is no conflict with Section 211, supra, or with the cases of Weiler v. Monroe County, 76 Miss. 492, 25 So. 352; Dantzler Lumber Company v. State, 97 Miss. 355, 53 So. 1; Bridgforth v. Middleton, 186 Miss. 185, 186 So. 837.

 As to the second contention, namely, the contracts were void because not placed on the minutes, it is true that "A board of supervisors can act only as a body, and its act must be evidenced by an entry on its minutes. The minutes of the board of supervisors are the sole and exclusive evidence of what the board did." Smith v. Board of Supervisors, 124 Miss. 36, 86 So. 707. But the minutes, in the first contract, according to the exhibits, evidenced what the board did, and showed the substantial provisions of the contract. This met the test laid down in Noxubee County v. Long, 141 Miss. 72, 106 So. 83 and Hall v. Franklin County, 184 Miss. 77, 185 So. 591.

In Noxubee County v. Long, supra, it was alleged that the road was abandoned by the board of supervisors at its December 1919 meeting, but that the order was not entered on the minutes. However at subsequent meetings, the minutes showed the "road discontinued", etc. The Court held that the minutes showed that the highway had been abandoned, saying "Although they (the minutes) may be unskillfully drawn, if by a fair and reasonable interpretation their meaning can be ascertained, they will be sufficient to answer the requirements of law * * * ". And in Hall v. Franklin County, supra, where the orders of the board in regard to a beer election were questioned, it was said: "It is not necessary for the Board of Supervisors, in their order, to recite all the evidence that appeared before them, or to set out in full, in their order, all the evidentiary matters pertinent to the controversy; it is sufficient to recite the jurisdictional facts, as ultimate facts, without reciting the evidence upon which such

facts depend for proof of their existence.'' See also Peoples Bank of Weir v. Attala County, 156 Miss. 560, 126 So. 192; Martin v. Board of Supervisors, 181 Miss. 363, 178 So. 315.

██ A sufficient allegation as to the lawful existence of the second contract was made as against the demurrer.

██ It is a matter of common knowledge that the plans and specifications form a part of a contract for the construction of public works; but it is unthinkable that a board of supervisors, in order to make a valid contract in such cases would be required to record all of such details on its minutes.

The third contention is in regard to the method of apportionment, that it was arbitrary, unjust and amounted to a donation and is in violation of Section 95, Constitution of 1890.

██ Since the contract recited that, by reason of the survey, there was apportioned to the parties the same proportion of the new water front as they had in 1847, which, for the purpose of this hearing must be taken as true, there was a compliance with the general rule for the apportionment of alluvion as announced by this Court in Smith v. Leavenworth, 101 Miss. 238, 57 So. 803, to-wit: ██ ''The general rule for apportioning alluvion between coterminous landowners is to give each such proportion of the new shore line as they possessed of the former shore line before the formation of the alluvion.'' The opinion did say that the above rule is not ''absolute.''

The second contract provided for an apportionment of the accretions, batture and alluvion by simply projecting the lines of the survey and boundary which were established by the contract of June 7, 1910. Hence assuming the allegations of the complaint to be true, it cannot be said that the methods, which were adopted for the apportionment of these accretions in the establishment of the lines between these lands, were so arbitrary and unjust as to be void and to amount to a

donation of public lands in contravention of Section 95 of the Constitution.

The fourth contention is that the agreements were void because the land commissioner was not a party to them. Now it is true that, under Section 6598, Code of 1942, ''The boards of supervisors, under the general supervision of the land commissioner, of the several counties wherein are situated any sixteenth section school lands or lands in lieu thereof, shall have jurisdiction and control of said school lands and of all funds arising from any disposition thereof heretofore or hereafter made; * * *''. But, by Section 6594, Code of 1942, the authority ''to ascertain the true condition of the title and to institute and prosecute * * * all necessary suits to establish and confirm the title * * *'' to Sixteenth Section land was delegated to, and the responsibility therefor rests solely on, the board of supervisors. Hence the land commissioner was not a necessary party to these agreements.

It must be borne in mind that, if the board had the authority to enter into the contracts in question, and if there was no donation, then the effect of such contracts, in the absence of fraud, cannot be avoided.

It therefore follows from what has been said above that the learned chancellor was correct in overruling the special demurrer, and that his decree to that effect should be, and is, affirmed.

Affirmed and remanded.

*Roberds, P. J.,* and *Hall, Holmes* and *Ethridge, JJ.,* concur.