IN THE SUPREME COURT OF MISSISSIPPI
NO. 2023-IA-00975-SCT

*HOUSING AUTHORITY OF THE CITY OF*
*YAZOO CITY, MISSISSIPPI, DANA NEELY,*
*CHAIRMAN, VERONICA STARLING,*
*COMMISSIONER, MAMIE J. WILLIAMS, VICE*
*CHAIRMAN, CAROLYN JOHNSON,*
*COMMISSIONER, HERBERT SCOTT, JR.,*
*COMMISSIONER, IN THEIR OFFICIAL*
*CAPACITY*

*v.*

*ALPRESTEON S. BILLINGS*


| | |
|---|---|
| DATE OF JUDGMENT: | 08/11/2023 |
| TRIAL JUDGE: | HON. JANNIE M. LEWIS-BLACKMON |
| TRIAL COURT ATTORNEYS: | LOUWLYNN VANZETTA WILLIAMS |
| | LILLI ALICIA EVANS BASS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | LILLI ALICIA EVANS BASS |
| ATTORNEY FOR APPELLEE: | LOUWLYNN VANZETTA WILLIAMS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND RENDERED - 03/13/2025 |
| MOTION FOR REHEARING FILED: | |


**BEFORE RANDOLPH, C.J., MAXWELL AND SULLIVAN, JJ.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1. After the Housing Authority of Yazoo City terminated its executive director, Alpresteon Billings, Billings sued the public board for breach of contract. But to enforce a contract with a public board—including an employment contract—"enough of the terms and conditions of the contract [must be] contained in the minutes for determination of the

liabilities and obligations of the contracting parties without the necessity of resorting to other evidence." ***Thompson v. Jones Cnty. Cmty. Hosp.***, 352 So. 2d 795, 797 (Miss. 1977).

¶2. While Billings claims she had an enforceable five-year employment contract with the Housing Authority, none of the alleged terms of the contract are contained in the Housing Authority's board minutes. In fact, the record shows that, while the Housing Authority and Billings anticipated entering a contract, no employment contract was ever executed before Billings's termination.

¶3. Because Billings failed to produce evidence the board's minutes contain enforceable contract terms, her breach-of-contract claim fails as a matter of law. We reverse the trial court's order denying the Housing Authority summary judgment on Billings's breach-of-contract claim. And we render judgment in the Housing Authority's favor.

**Background Facts & Procedural History**

**I.      Billings's Hiring and Firing**

¶4. On July 17, 2018, John Meeks—chairman of the Housing Authority's board of commissioners—sent Billings a letter. This letter congratulated Billings on being selected as the Housing Authority's executive director. It stated that the commissioners expected Billings "to start on July 18, 2018 at 8 a.m. with a salary of $65,000 (Sixty-five thousand dollars) with a 6% increase annually which will be included in a five (5) year contract."

¶5. The Housing Authority's board minutes reflect that the five commissioners had met at a regularly scheduled meeting that same day—July 17, 2018. During this meeting, the board went into executive session. While Billings asserts the reason for the executive session

was to discuss her hiring, the minutes do not disclose why the executive session was called. Nor do the minutes show what was discussed. And the minutes make no reference to any employment decision being made.

¶6. The Housing Authority board of commissioners next met at a specially called meeting on July 31, 2018. Only three of the five commissioners attended. At this meeting, the board again went into executive session. The minutes state that the purpose of the executive session was "to discuss personnel/staff." According to the minutes, "The action taken in Executive Session was the approval of the Executive Director's contract." But no contract was attached to the minutes. Neither did the minutes spell out the contract's basic terms. Instead, the minutes record that "Chairman Meeks was responsible for meeting with attorney Barry Bridgforth to receive the final draft of the contract to execute." The meeting was then adjourned.

¶7. The next regularly called Housing Authority board meeting was August 21, 2018. All five commissioners attended. So did Billings, in her new role as executive director. The board approved the minutes of the specially called July 31, 2018 meeting by a vote of three to two—the three commissioners who had attended the special meeting voted to approve, while the two absent commissioners voted against approval.

¶8. Billings's tenure as head of the Housing Authority was short-lived. In the months following Billings's hiring, the Housing Authority removed the three commissioners who had

attended the specially called July 31, 2018 meeting.  The Housing Authority then terminated Billings's employment on February 20, 2019.[1]

## II. Billings's Lawsuit

¶9. Billings sued the Housing Authority and the five current commissioners in their individual and official capacities.  She brought a breach-of-contract claim against the Housing Authority.  And she asserted claims of wrongful termination, tortious interference with employment, and negligent and intentional infliction of emotional distress against the commissioners.

¶10. The Housing Authority and commissioners filed a joint motion for summary judgment. The Housing Authority argued no contract between it and Billings existed because the minutes neither reflected approval of any contractual terms nor contained any contract. The commissioners argued they were immune and that Billings had not alleged any conduct for which there were not immune.

¶11. To support its summary-judgment motion, the Housing Authority attached the July 17, July 31, and August 20, 2018 board minutes.  It also attached a transcript of Billings's deposition testimony.  In her deposition, Billings conceded the minutes contained no votes to authorize the July 17, 2018 hiring letter or its terms.  She also acknowledged the minutes

---

[1] According to one board member, the Housing Authority discovered Billings had a conflict of interest in direct violation of agency policy.  Apparently, Billings had been offered the role as chief executive of Gateway Community Development Corporation, a separate entity that did business with the Housing Authority.  This board member testified that the Housing Authority, after explaining the conflict of interest, gave Billings the option to stay with the Housing Authority or take the Gateway position.  When Billings accepted the Gateway position, the board terminated her.   Billings, on the other hand, testified she was unaware of the conflict of interest.

contained no votes to hire her as executive director. Finally, she agreed the terms of her employment contract were "[n]ot in the minutes" and that no contract was ever signed by any Housing Authority commissioner. Instead, she admitted that the employment contract was still in draft form.

¶12. The Housing Authority also attached to its summary-judgment motion an email from Billings to her attorney dated September 18, 2018. In this email, Billings conveyed to her attorney that she "was told that no action was tak[en] by Barry Bridgforth[,] the Board attorney." She asked if it was "possible for you to reach to Barry and get an update on the issues or concern with my contract please."

¶13. In response to the summary-judgment motion, Billings argued the rule requiring public contracts to be on the board's minutes does not apply to employment contracts. Alternatively, she asserted the Housing Authority's board minutes "speak to a contract approval for Mrs. Billings" and that she reasonably relied on Chairman Meeks's July 17, 2018 letter.

¶14. In support, Billings attached the letter and affidavits from the three former commissioners who had been present at the July 31, 2018 specially called meeting. All three said it was "Board's intention that Mrs. Billings would be under contract for a period of five years" with "a base salary of $65,000.00." All three also claimed she was "not an at-will employee."

¶15. The trial court granted in part and denied in part the summary-judgment motion. The trial judge agreed the five named commissioners were immune under the Mississippi Tort

5

Claims Act. Miss. Code Ann. § 11-46-7(2) (Rev. 2019). The judge also determined Billings failed to establish a genuine material fact issue in her claims against them. So the trial court entered a final judgment against Billings in favor of the commissioners. M.R.C.P. 56(b).

¶16. But the judge determined genuine issues of material fact existed surrounding Billings's breach-of-contract claim against the Housing Authority. So the trial court denied summary judgment on this one claim. The Housing Authority petitioned this Court to file an interlocutory appeal. And this Court granted the Housing Authority's request.

## Discussion

¶17. This Court reviews the denial of summary judgment de novo. *Harrison v. Chandler-Sampson Ins., Inc.*, 891 So. 2d 224, 228 (Miss. 2005). We apply the same standard as the trial court. *Id.* "We view the evidence in the light most favorable to the non-movant." *Woodard v. Miller*, 326 So. 3d 439, 446 (Miss. 2021) (citing *Harrison*, 891 So. 2d at 228). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c).

¶18. Here, the trial judge found there were genuine issues of material fact concerning Billings's breach-of-contract claim. And had Billings been employed by a *private* company, we would agree. In such a case, viewing the evidence—especially the hiring letter and the former commissioners' affidavits—in the light most favorable to Billings, a fact question would exist over whether an enforceable employment contract had been formed. But

6

Billings's alleged employment contract was not with a private company—it was with a *public* entity. And we have been clear that "public boards speak only through their minutes and their actions are evidenced solely by entries on the minutes." *Thompson*, 352 So. 2d at 796 (citing *Miss. State Highway Comm'n v. Sanders*, 269 So. 2d 350 (Miss. 1972); *Cheatham v. Smith*, 229 Miss. 803, 92 So. 2d 203 (1957), *superseded by statute as stated in Shipman v. N. Panola Consol. Sch. Dist.*, 641 So. 2d 1106 (Miss. 1994); *Bd. of Supervisors of Adams Cnty. v. Giles*, 219 Miss. 245, 68 So. 2d 483 (1953); *Thornhill v. Ford*, 213 Miss. 49, 56 So. 2d 23 (1952); *Martin v. Newell*, 198 Miss. 809, 23 So. 2d 796 (1945); *Smith Cnty. v. Mangum*, 127 Miss. 192, 89 So. 913 (1921); *Bridges & Hill v. Bd. of Supervisors of Clay Cnty.*, 58 Miss. 817 (1881)). "It is also well established that each person, firm or corporation contracting with a [public] board . . . is responsible to see that the contract is legal and properly recorded on the minutes of the board." *Id.* (citing *Burt v. Calhoun*, 231 So. 2d 496 (Miss. 1970); *Martin*, 23 So. 2d 796; *Jackson Equip. & Serv. Co. v. Dunlop*, 172 Miss. 752, 160 So. 734 (1935)). While the entire contract need not be placed on the board's minutes, the minutes must contain "enough of the terms and conditions of the contract" to determine "the liabilities and obligations of the contracting parties without the necessity of resorting to other evidence." *Id.*

¶19. Here, the July 17, 2018 hiring letter and affidavits of the three now-removed commissioners fall into the category of "other evidence"—evidence that courts cannot resort to. *Id.* The only relevant evidence in Billings's breach-of-contract claim are the board's minutes. And the minutes, at best, reflect the board in executive session approved "the

Executive Director's contract," which was not in final form. The minutes do not contain any of the contract's terms—much less mention whom the contract was with. Furthermore, the minutes do not name Billings as the approved executive director. Nor do they reflect the duration of the contract or the amount of compensation. So there is simply no way to determine "the liabilities and obligations of the contracting parties" without going outside the minutes. *Id.* Thus, Billings's action to enforce the alleged contract fails as a matter of law.

¶20. Still, Billings suggests this clear rule of law—that public boards may only speak through their minutes—does not apply here. She says her case differs because she sought enforcement of an employment contract, not a services contract. It is true that the Housing Authority did cite ***KPMG, LLP v. Singing River Health System***, 283 So. 3d 662 (Miss. 2019)—a case involving a services contract—to support that public boards may only speak through their minutes. But in ***KPMG, LLP***, we did not create new law that says the minutes rule applies *only* to services contracts. Instead, we applied the long-standing rule that a public board can only act as a collective body as evidenced by its minutes. *Id.* at 669 (citing ***Wellness, Inc. v. Pearl River Cnty. Hosp.***, 178 So. 3d 1287, 1290 (Miss. 2015); ***Ladner v. Harrison Cnty. Bd. of Supervisors***, 793 So. 2d 637, 639 (Miss. 2001); ***Nichols v. Patterson***, 678 So. 2d 673, 677 (Miss. 1996); ***Bruner v. Univ. of S. Miss.***, 501 So. 2d 1113, 1116 (Miss. 1987); ***Thompson***, 352 So. 2d at 796; ***Sanders***, 269 So. 2d 350; ***Cheatham***, 92 So. 2d 203; ***Giles***, 68 So. 2d 483; ***Thornhill***, 56 So. 2d 23; ***Martin***, 23 So. 2d 796; ***Mangum***, 89 So. 913; ***Marion Cnty. v. Foxworth***, 83 Miss. 677, 36 So. 36 (1904); ***Bridges & Hill***, 58 Miss. 817).

¶21.   And this Court certainly applied the minutes rule to an employment contract in *Thompson*, 352 So. 2d 795—a case factually similar and instructive to this one. There, a community hospital's board minutes "reflected that [James Thompson] was to be given a four year contract as executive director." *Id.* at 797. Like this case, the minutes then "directed [Thompson's attorney] . . . draw up the terms of the agreement for approval by the board at its next meeting." *Id.* "At the next meeting[,] . . . the minutes reflect[ed] that a proposed contract was discussed and reviewed by the board, and the president and secretary were authorized to execute a contract with plaintiff on behalf of the board." *Id.* But "[t]he minutes contain[ed] no reference to the salary to be paid plaintiff for his services." *Id.* And "because the minutes d[id] not reflect the amount of the salary to be paid to [Thompson]," this Court concluded it could not go outside the minutes to "determine the amount of the salary." *Id.* at 797-98. Instead, it was Thompson's "responsibility . . . to see that the contract was properly recorded on the minutes." *Id.* at 798.

¶22.   The minutes in this case are even more lacking. They neither contain a salary nor even mention Billings's name or the length of her tenure. So there is nothing for the trial court to enforce in a breach-of-contract action.

¶23.   We reverse the trial court's denial of summary judgment on Billings's breach-of-contract claim, and we render judgment in the Housing Authority's favor.

¶24.   **REVERSED AND RENDERED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., CHAMBERLIN, ISHEE, GRIFFIS, SULLIVAN AND BRANNING, JJ., CONCUR.**